UNIVERSITY OF COLORADO, Boulder, Through its Board, The REGENTS OF the UNIVERSITY OF COLORADO, a body corporate; Judith Albino, as President of the University of Colorado, Boulder; and William Marolt, as Athletic Director, Department of Intercollegiate Athletics, Petitioners,

v.

David DERDEYN, individually and on behalf of all others similarly situated, Respondents.

No. 92SC86.

Supreme Court of Colorado,
En Banc.

Nov. 1, 1993.

Rehearing Denied Dec. 6, 1993.

Cooper & Kelley, P.C., Thomas B. Kelley, John R. Mann, Denver, Robert F. Nagel,

University of Colorado School of Law, Boulder, Richard A. Tharp, Beverly Fulton, Office of University Counsel, Denver, for petitioners.

American Civil Liberties Union, David H. Miller, Denver, Norton Frickey & Associates, Judd Golden, Boulder, for respondents.

Justice LOHR delivered the Opinion of the Court.

We granted certiorari in order to determine whether random, suspicionless urinalysis-drug-testing of intercollegiate student athletes by the University of Colorado, Boulder (CU), violates the Fourth Amendment to the United States Constitution [1] or Article II, Section 7, of the Colorado Constitution. Following a bench trial conducted in August of 1989 in which a class of current and prospective CU athletes challenged the constitutionality of CU's drug-testing program, the Boulder County District Court permanently enjoined CU from continuing its program. The trial court found that CU had not obtained voluntary consent from its athletes for such testing, and it declared such testing unconstitutional under both the federal and state constitutions. The Colorado Court of Appeals generally affirmed. *See Derdeyn v. University of Colorado*, 832 P.2d 1031 (Colo. App.1991). We agree with the court of appeals, *see id.* at 1034–35, that in the

absence of voluntary consents, CU's random, suspicionless urinalysis-drug-testing of student athletes violates the Fourth Amendment to the United States Constitution and Article II, Section 7, of the Colorado Constitution. We further agree, *see id.* at 1035, that the record supports the finding of the trial court that CU failed to show that consents to such testing given by CU's athletes are voluntary for the purposes of those same constitutional provisions. Accordingly, we affirm the judgment of the court of appeals.

I

CU began a drug-testing program in the fall of 1984 for its intercollegiate student athletes. CU has since amended its program in various ways, but throughout the existence of the program participation was mandatory in the sense that if an athlete did not sign a form consenting to random urinalysis pursuant to the program, the student was prohibited from participating in intercollegiate athletics at CU.[3]

CU's drug-testing program originally required a urine test for certain proscribed drugs [4] at each intercollegiate athlete's annual physical and also required random urine tests thereafter. Counseling was mandated following a first positive result. The penalty for a second positive included a seven-day suspension from participation in intercollegiate athletics, and the penalty for

---

1. Strictly speaking, the issue before us is whether the University of Colorado's drug-testing program violates the Fourth Amendment to the United States Constitution as made enforceable against the states through the Due Process Clause of the Fourteenth Amendment. *Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361–62, 93 L.Ed. 1782 (1949).

    The parties have agreed that the University of Colorado, Boulder, is a state institution, and that the actions of the individual defendants constitute state action for all purposes relevant to this case.

2. Recently, in *City and County of Denver v. Casados*, 862 P.2d 908 (Colo.1993), we rejected a Fourth Amendment facial challenge to an Executive Order of the Mayor of the City and County of Denver establishing a program for mandatory blood- and urinalysis-drug-testing of city employees based on reasonable suspicion of alcohol or drug use or impairment. CU's program at issue here, in contrast, provides in some

instances for random testing of intercollegiate student athletes without the necessity for suspicion, reasonable or otherwise, and in others for testing based on criteria that the trial court found to be incapable of indicating drug use to any degree.

3. In written descriptions, CU itself has always characterized its drug-testing program as "a mandatory program of drug education, testing, and counseling/rehabilitation."

4. The proscribed drugs as specified by CU in its 1984 form entitled "UNIVERSITY OF COLORADO INTERCOLLEGIATE ATHLETICS DRUG EDUCATION PROGRAM" (the 1984 Form) were amphetamines, barbiturates, cocaine, methaqualudes, opiates, morphine, codeine, PCP (angel dust) and analogues, and tetrahydrocannabinol (THC or marijuana).

a third positive included a minimum one-year suspension. No specific monitoring procedures were prescribed for the collection of the urine samples, and two students testified that during this phase of the program they were not monitored during the act of urination. According to CU's 1984 Form[5] describing the program, all test[6] results were sent to the "Team Physician." The intercollegiate student athletes also were required to give their consent to releasing test results to

> the Head Athletic Trainer at [CU]; my parent(s) or legal guardian(s) or spouse; the head coach of any intercollegiate sport in which I am a team member; the Athletic Director of [CU]; and the Drug Counseling Program at the Wardenburg Student Health Center.

The 1984 Form gave no general or specific assurances of confidentiality.

Sometime thereafter,[7] CU amended its program for the first time. The penalty for a first positive was changed to include suspension for "the current competitive season," and the penalty for a second positive was changed to include permanent suspension from "any activity sponsored by the University of Colorado Athletic Department." Following a first positive, the ath-lete was also required successfully to complete a substance abuse rehabilitation program as a condition for further participation in intercollegiate athletics. The first amended program also provided that the "collection of the specimen will be observed [sic], and the athlete may be asked to disrobe in order to protect the integrity of the testing procedure."[8] Test results were still sent to the "Team Physician," but following a first positive, the first amended program stated:

> [T]he Team Physician will inform the Head Athletic Trainer. The Head Athletic Trainer will advise the Athletic Director. The Athletic Director will notify the athlete's Head Coach(es). Additionally, the athlete will be required to ... participate in a conference telephone call between the athlete, his/her parent(s) or legal guardian(s) of the positive test results.

CU still gave no general or specific assurances of confidentiality of test results.

CU's second amended program changed the penalty for a first positive from suspension for "the current competitive season," to suspension for "a twelve month period." In all other relevant respects the program remained unaltered.

---

5. *See supra* note 4.

6. Testing was performed by an independent, commercial laboratory.

7. CU amended its original program three times, and the third amendment became effective on August 14, 1988. An official from CU testified that the program was reviewed annually in order to determine if changes in the program should be made. However, with the exception of the third amended program, the record is unclear on when, exactly, the amended programs took effect.

8. One male student athlete testified that during this phase of the program the
> trainer would hand you a bottle, a screw cap bottle and you and the trainer would adjourn to a restroom where the trainer would physically observe you filling up the bottle with your urine.
> ....
> I mean that the trainer would actually watch you urinate, you weren't allowed to turn your back, talking about full frontal exposure of your body.

A female student athlete testified:
> Some female trainer had to be in the restroom watching you, in the actual stall watching you while you went to the bathroom.

Another female student athlete testified:
> You came into the track office and the trainer would come in and post all the peoples' names that were on the team.
> ....
> That is what we called it, after a while, "the pee team". You kind of got flippant about it after a while because it was so embarrassing and everybody had to do it so we made jokes about it so that, you know, it wouldn't be as bad. Then, you would go into the bathroom with one of the trainers because at that time the training room was in the track office so you got one of the trainers and you went to the bathroom and she gave you a coke cup and you peed in the cup with the door open so she could watch and then you take your urine sample and you pour it in the bottle and screw the bottle up and she writes your number or whatever on it and then takes it away.

CU's third amended program, which became effective August 14, 1988, contained numerous changes. First, it added alcohol, "over-the-counter drugs," and "performance-enhancing substances such as anabolic steroids" to the list of drugs for which students could be tested. Second, the term "athlete" was defined to include "all student participants in recognized intercollegiate sports, including but not limited to student athletes, cheerleaders, student trainers and student managers." Third, random "rapid eye examination (REE)" testing was substituted for random urinalysis, and a urinalysis was performed only after a "finding of reasonable suspicion that an athlete has used drugs," and at the athlete's annual physical examination. Failure to perform adequately on an REE was considered *"prima facie* reasonable suspicion of drug use [except with regard to steroids]," and the student was required to provide a urine specimen for testing purposes if the student did not perform adequately on the REE. In addition, if a student exhibited "physical or behavioral characteristics indicating drug use including, but not limited to: tardiness, absenteeism, poor heath [sic] habits, emotional swings, unexplained performance changes, and/or excessive aggressiveness," this was also considered reasonable suspicion of drug use, and the student was required to take a urine test. Fourth, urine samples were to be collected "within the Athletic Department facilities," and athletes were "directed to provide a urine specimen in a private and enclosed area" while a monitor remained outside. The monitor would then receive "the sample

from the athlete and check[ ] the sample for appropriate color, temperature, specific gravity and other properties to determine that no substitution or tampering has occurred." Fifth, the athletes were required to give their consent to releasing test results to

> the Head Athletic Trainer at [CU]; my parent(s) or legal guardian(s), if I am under the age of 21; the head coach of any intercollegiate sport in which I am a team member; the Athletic Director of [CU]; my work supervisor (if applicable) and the Drug Counseling Program at the Wardenburg Student Health Center.

Finally, although CU still gave no general assurances of confidentiality, it did specify in its third amended program that communications between an athlete and physicians at Wardenburg Student Health Center would be confidential. In October of 1986, intercollegiate student athletes at CU filed a class action suit [9] in Boulder County District Court challenging the constitutionality of the drug-testing program as it then existed and seeking declaratory and injunctive relief.[10] Named as defendants were CU, the board of regents of CU, Judith Albino as president of CU, and William Marolt as athletic director, department of intercollegiate athletics. When CU subsequently amended its program, an issue arose as to which version of CU's program, if any, could be challenged at trial. CU argued that the case was moot because it "would be futile to discuss the merits of a drug-testing policy the University has no intention of reinstating." However, by minute order, the trial court found that CU

---

9. A class was certified by stipulation on January 27, 1987. The class consists of:

> Those present and prospective undergraduate student athletes who are or will be subject to the University of Colorado intercollegiate athletic department's drug education program as a condition of participation in the University of Colorado intercollegiate athletic program limited as follows: Those present undergraduate student athletes who have never tested positive or have been subject to discipline or sanction as a result of a positive test result; and those present student athletes who, although having executed waivers, consents or agreements to participate in the University of

> Colorado's drug education program, object to the program as being an unconstitutional condition of participation; and lastly, those prospective undergraduate student athletes who will execute waivers, consents or agreements to participate in the University of Colorado's drug education program, but who object to the program as being an unconstitutional condition of participation.

10. Based on allegations in the plaintiffs' complaint, the then existing program was the first amended program, according to which students were directly observed during the act of urination and the penalty for a first positive included suspension for the current competitive season.

and the other defendants have "refused to agree that they will not return to the policy which was initially challenged in this class action. In fact, defendants have indicated that there are circumstances under which they would return to that policy." The trial court concluded "[t]herefore, ... the legality of [CU's] prior drug-testing policy is not moot," and it noted that it had "previously ruled that plaintiffs are to amend the complaint to add allegations concerning the new policy." The plaintiffs filed their amended complaint on March 16, 1989, the same day that the trial court signed the minute order. In their amended complaint, the plaintiffs sought relief from CU's random drug-testing programs, past, present, and future. Accordingly, at issue in the ensuing trial was the constitutionality of every version of CU's drug-testing program.

Following a bench trial conducted in August of 1989, the trial court entered its written findings of fact, conclusions of law, and order and judgment. The trial court found that "[o]btaining a monitored urine sample is a substantial invasion of privacy." It found that the

> REE does not function, in any sense, as "reasonable suspicion" of drug use. Because of its disastrous ability to predict drug use, it functions more as an avenue to inject arbitrary judgments into an otherwise random selection of students for testing.

Similarly, it found that "[l]ike the REE, the [other] reasonable suspicion criteria [as set forth by CU] are incapable of indicating drug use to *any* degree" (emphasis in original). The trial court also found that while

> the University labels the program as a "Drug Education Program", there is little education.... There is no ongoing educational component of the program. Testing is clearly its major focus.

Finally, the trial court found that there

> is no evidence that the University instituted its program in response to any actual drug abuse problem among its student athletes. There is no evidence that any person has ever been injured in any way because of the use of drugs by a student athlete while practicing or playing a sport.

The trial court explained that the governmental interests asserted by CU in favor of its program were "compliance with NCAA required tests, a concern for the students' health and safety, and a need to promote fair competition." Although the trial court agreed that the goals embodied by these interests were commendable and valid, the trial court ruled that under *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989),[11] and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989),[12]

**11.** In *Skinner,* the United States Supreme Court upheld suspicionless blood- and urinalysis-drug-testing of railroad employees involved in certain types of train accidents. *Id.* at 609, 634, 109 S.Ct. at 1408, 1422. Such testing was mandated by regulations promulgated by the Federal Railroad Administration under the authority of the Federal Railroad Safety Act of 1970, 84 Stat. 971, 45 U.S.C. § 431(a). *Skinner,* 489 U.S. at 606, 109 S.Ct. at 1407. The Court found that the government's interest in suspicionless testing of "railroad employees engaged in safety-sensitive tasks," *id.* at 633, 109 S.Ct. at 1422, was "compelling," *id.* at 628, 633, 109 S.Ct. at 1419, 1422, because employees "subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences," *id.* at 628, 109 S.Ct. at 1419. On the other hand, the Court found that such employees had diminished expectations of privacy for the purposes of the Fourth Amendment because they "partic-

ipat[ed] in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Id.* at 627, 109 S.Ct. at 1418. Noting also that the regulations in question "do not require that [urine] samples be furnished under the direct observation of a monitor," *id.* at 626, 109 S.Ct. at 1418, the Court concluded that the suspicionless searches were reasonable under the Fourth Amendment because "the Government's compelling interests outweigh[ed the employees'] privacy concerns," *id.* at 633, 109 S.Ct. at 1422.

**12.** In *Von Raab,* the United States Supreme Court upheld suspicionless urinalysis-drug-testing of United States Customs Service employees seeking transfer or promotion to positions in which they would be directly involved in the interdiction of illegal drugs, or would be required to carry firearms or to handle classified information that is truly sensitive. *Id.* at 659,

they were not sufficiently compelling as governmental interests to outweigh an intrusion on the reasonable privacy expectations of students that is "clearly significant." Therefore, the trial court concluded, CU's random urinalysis-drug-testing of athletes without individualized suspicion violates the Fourth Amendment's guarantee that persons shall be secure against unreasonable searches and seizures conducted by the government. The trial court also held that "[n]o intrusion, however slight, can be deemed 'reasonable' for purposes of the Fourth Amendment where the intrusion will not and cannot reveal the information sought," and that therefore, the "rapid eye exam is an unconstitutional intrusion under the 'reasonableness' standard of the Fourth Amendment." Similarly, because it found that the other reasonable suspicion criteria relied upon by CU were incapable of indicating drug use to any degree, the trial court held that "failure makes 'unreasonable' [under the Fourth Amendment] any search [e.g., urinalysis] conducted pursuant to those criteria." [13]

The fact that CU's athletes signed forms consenting to random drug testing did not alter the trial court's conclusion. Rather, the trial court found that CU failed to demonstrate that the consents given by the athletes were voluntary, and also held that "no consent can be voluntary where the failure to consent results in a denial of the governmental benefit."

On these bases, the trial court declared that CU's drug-testing program was unconstitutional. It permanently enjoined CU from "requiring any urine samples from student athletes for the purposes of drug testing, whether those tests occur on a random basis or as a result of the 'reasonable suspicion' criteria stated," and it permanently enjoined CU from "requiring student athletes participation in the Rapid Eye Exam procedure." In addition, the trial court held that "reasonable suspicion" is not the appropriate standard to warrant urinalysis-drug-testing of athletes by CU, and that such testing is impermissible absent probable cause under either the Fourth Amendment or Article II, Section 7, of the Colorado Constitution.

The Colorado Court of Appeals generally affirmed. *See Derdeyn*, 832 P.2d 1031. The court of appeals explained that CU did not appeal the trial court's findings relating to the REE, but only those relating to urinalysis. *Id.* at 1033. It held in part II of its opinion that CU's urine testing program was unconstitutional under the Fourth Amendment and under Article II, Section 7, of the Colorado Constitution, *id.* at 1035, and it affirmed the trial court's permanent injunction prohibiting CU from testing its athletes pursuant to its original program or any of its amended programs,

677–79, 109 S.Ct. at 1387, 1396–97. The Court found that the government's interest in the suspicionless testing of such employees was "compelling," *id.* at 672, 674, 677, 109 S.Ct. at 1394, 1395, 1396, "[i]n light of the extraordinary safety and national security hazards that would attend the promotion of drug users to positions that require the carrying of firearms or the interdiction of controlled substances," *id.* at 674, 109 S.Ct. at 1395, or the handling of truly sensitive, classified information, *id.* at 677, 109 S.Ct. at 1396. On the other hand, the Court found that such employees had diminished expectations of privacy for the purposes of the Fourth Amendment because "[u]nlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity," *id.* at 672, 109 S.Ct. at 1394, and "[m]uch the same is true of employees who are required to carry firearms," *id.*, or who are already subject to background investigations because of their access to government secrets, *id.*

at 677–78, 109 S.Ct. at 1396–97. The Court concluded that the suspicionless searches were reasonable under the Fourth Amendment because the "Government's compelling interests in preventing the promotion of drug users to positions where they might endanger the integrity of our Nation's borders or the life of the citizenry outweigh the privacy interests of those who seek promotion to these positions," *id.* at 679, 109 S.Ct. at 1398, although the Court remanded for further factual determinations on the issue of which employees are likely to gain access to "truly sensitive information," *id.* at 677, 679, 109 S.Ct. at 1396, 1397.

13. For somewhat different reasons, the trial court also held that CU's random urine and REE testing, as well as its urine testing based on "reasonable suspicion" generated by REE testing or other stated criteria, violated Article II, Section 7, of the Colorado Constitution.

*id.* In addition, although the court of appeals did not disturb the trial court's finding that CU's stated "reasonable suspicion" criteria were wholly ineffective, or the trial court's ruling that mandatory urinalysis based upon such criteria is unconstitutional, it held in part IV of its opinion that objective, reasonable, individualized suspicion of drug use could in some circumstances warrant mandatory drug testing of intercollegiate athletes by CU. *Id.*[14] Accordingly, the court of appeals reversed the order of the trial court only insofar as it prohibited all testing not premised on probable cause. *Id.* at 1035–36.

We granted CU's petition for writ of certiorari on the following issues:

In the context of the University's drug-testing program, is suspicionless drug testing constitutionally reasonable?

Can student athletes give valid consent to the University's drug-testing program if their consent is a condition of participation in intercollegiate athletics at the University?

14. It is not perfectly clear whether the court of appeals based this holding in part IV only on the Fourth Amendment, or whether it based it on the Fourth Amendment and Article II, Section 7, of the Colorado Constitution. On the one hand, the court of appeals cites only two cases in support of this holding, specifically, *In re P.E.A.,* 754 P.2d 382 (Colo.1988) (search of a public high school student's car was not unconstitutional), and *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (search of a public high school student's purse did not violate Fourth Amendment standard of reasonableness). Furthermore, *P.E.A.* never cites or refers to the Colorado Constitution; it relies very heavily on *T.L.O.,* and it states that "[t]he focal issue in this case is whether P.E.A.'s fourth amendment rights were violated when school officials questioned and searched him...." *P.E.A.,* 754 P.2d at 386. Thus it seems that the court of appeals did not base its holding in part IV on the Colorado Constitution.

On the other hand, in part II of its opinion, the court of appeals acknowledges that "in some instances, [Article II, Section 7,] may protect against invasions that the federal constitution would not prohibit." *Derdeyn,* 832 P.2d at 1035. Furthermore, because the court of appeals holds in part II that CU's urine testing program is unconstitutional under the Colorado Constitution, one might expect the court of appeals to reach in part IV of its opinion the issue of whether, under the Colorado Constitution, prob-

▮▮▮ We hold that in the absence of voluntary consents, CU's random, suspicionless urinalysis-drug-testing of student athletes violates the Fourth Amendment to the United States Constitution and Article II, Section 7, of the Colorado Constitution. *See infra* part IIA.[15] We further hold that the record supports the trial court's finding that CU failed to show that its athletes consent voluntarily to its drug-testing program. *See infra* part IIB. Finally, because we granted certiorari on the issue of whether, in the context of CU's drug-testing program, *suspicionless* drug-testing is constitutionally reasonable, and not on the issue of whether reasonable suspicion is ever a sufficient predicate to mandatory urinalysis-drug-testing of athletes by CU, and because the parties have briefed the former but not the latter issue, we express no opinion on the latter issue under either the federal or the state constitution.

## II

▮▮▮ The Fourth Amendment to the United States Constitution protects individuals

able cause is required as a premise for urinalysis-drug-testing by CU.

On balance, and especially in light of the authority cited by the court of appeals in part IV, we think the more plausible reading is that the court of appeals did not reach the issue of whether, under the Colorado Constitution, probable cause is required as a premise for urinalysis-drug-testing by CU.

15. At oral argument, CU requested that we review the program that was in effect at the time that the trial court issued its permanent injunction, except that we should ignore the REE component of that program. In other words, CU requested that we limit our review to only the third amended program, absent the REE component. We decline to do so for two reasons. First, the REE was an integral component of the third amended program, and so it is impossible to be precise about what, exactly, that program would be without the REE component. Second, as the trial court found, CU, in effect, has reserved a right to return to any of the drug-testing procedures that it used in its earlier programs. For that reason, the trial court reviewed all of CU's programs that preceded the trial. Our review is similarly broad, absent, of course, any consideration of the REE. In other words, we review in this opinion random, suspicionless urinalysis-drug-testing by CU of student athletes as that testing has been conducted pursuant to any of CU's drug-testing programs to the date of trial.

from unreasonable searches conducted by the government, *Von Raab*, 489 U.S. at 665, 109 S.Ct. at 1390, even when the government acts as the administrator of an athletic program in a state school or university. *See Schaill ex rel. Kross v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309 (7th Cir.1989); *Brooks v. East Chambers Consol. Indep. Sch. Dist.*, 730 F.Supp. 759 (S.D.Tex.1989); *cf. New Jersey v. T.L.O.*, 469 U.S. 325, 333–37, 105 S.Ct. 733, 738–40, 83 L.Ed.2d 720 (1985) (holding that the Fourth Amendment prohibits unreasonable searches and seizures conducted by public school officials acting as civil authorities). Furthermore,

> [b]ecause it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, ... these intrusions must be deemed searches under the Fourth Amendment.

*Skinner*, 489 U.S. at 617, 109 S.Ct. at 1413 (footnote omitted). It follows that CU's urinalysis-drug-testing program must meet the reasonableness requirement of the Fourth Amendment.

A search must usually be supported by a warrant issued upon probable cause. *Von Raab*, 489 U.S. at 665, 109 S.Ct. at 1390. However, neither a warrant, nor probable cause, nor any measure of individualized suspicion is an indispensable component of reasonableness in every circumstance. *Id.; Skinner*, 489 U.S. at 618–24, 109 S.Ct. at 1413–14. Rather,

> where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.

*Von Raab*, 489 U.S. at 665–66, 109 S.Ct. at 1390–91.

It is clear that CU's drug-testing program is not designed to serve the ordinary needs of law enforcement. We must therefore balance individual student athletes' privacy expectations against CU's govern-

mental interests to determine whether CU's random, warrantless, suspicionless urinalysis-drug-testing program is unreasonable under the Fourth Amendment. *See Skinner*, 489 U.S. at 619, 109 S.Ct. at 1414 ("What is reasonable ... 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" and "[t]hus, the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'") (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985), and *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)); *T.L.O.*, 469 U.S. at 337, 105 S.Ct. at 740 ("Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.'") (quoting *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967)); *International Bhd. of Elec. Workers, Local 1245 v. United States Nuclear Regulatory Comm'n (NRC)*, 966 F.2d 521, 525 (9th Cir.1992); *Dimeo v. Griffin*, 943 F.2d 679, 681 (7th Cir.1991) (en banc); *National Fed'n of Fed. Employees v. Cheney*, 884 F.2d 603, 608 (D.C.Cir.1989).

CU advances alternative theories to support its claim that its drug-testing program is reasonable under the Fourth Amendment. First, CU argues that its drug-testing program is reasonable under the Fourth Amendment because of the student athletes' diminished expectations of privacy and the compelling governmental interests served by the program. Second, CU argues that even if its drug-testing program is not otherwise constitutionally reasonable, there is no constitutional violation because its student athletes voluntarily con-

sent to testing. We address these arguments in turn.

## A

CU argues that its drug-testing program is reasonable under the Fourth Amendment because of the student athletes' diminished expectations of privacy and the compelling governmental interests served by the program. We therefore consider in turn (1) the degree to which CU's drug-testing program intrudes on the reasonable expectations of privacy of student athletes and (2) the magnitude of the governmental interests served by the program. We then balance these factors in order to determine whether CU's drug-testing program is reasonable under the Fourth Amendment.

## 1

Although nonvoluntary, random, suspicionless urinalysis-drug-testing by the government always intrudes on an individual's Fourth Amendment privacy interests, the magnitude of that intrusion can vary from context to context. *See Von Raab*, 489 U.S. at 671, 109 S.Ct. at 1393 ("The interference with individual privacy that results from the collection of a urine sample for subsequent chemical analysis could be substantial in some circumstances."). Some of the factors that courts have taken into account in determining the magnitude of such intrusions include the particular place and manner in which the urine sample is collected, *Skinner*, 489 U.S. at 626–27, 109 S.Ct. at 1418–19; *Schaill*, 864 F.2d at 1318, whether the individual participates "in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees," *Skinner*, 489 U.S. at 627, 109 S.Ct. at 1418, the operational reali-

ties of the workplace in which an individual is subjected to drug testing, *Von Raab*, 489 U.S. at 671, 109 S.Ct. at 1393, whether the individual "for whatever reason [is] subject to frequent medical examinations," *Dimeo*, 943 F.2d at 682, and the consequences of refusing to give a urine sample, *Schaill*, 864 F.2d at 1319–20. CU asserts in its brief that the magnitude of the intrusion of its drug-testing program on its athletes is minimal for a variety of reasons. Specifically, CU asserts that (a) collection of the urine sample in a closed stall with aural monitoring minimizes any intrusion. CU also asserts that student athletes' expectations of privacy with regard to urinalysis are diminished because (b) they routinely give urine samples as part of annual, general medical examinations; because (c) they submit to extensive regulation of their on- and off-campus behavior, including maintenance of required levels of academic performance, monitoring of course selection, training rules, mandatory practice sessions, diet restrictions, attendance at study halls, curfews, and prohibitions on alcohol and drug use; because (d) they must submit to the NCAA's random urinalysis-drug-testing program as a condition of participating in NCAA competition; because (e) the consequences of refusing to provide a urine sample are not severe; and because (f) positive test results are confidential and are not used for the purposes of criminal law enforcement.[16]

We consider each of these assertions in the order stated. As a preliminary matter, however, we note two things. First, in support of these assertions, CU cites various exhibits and testimony contained in the record, all of which were originally presented in full to the trial court for its consideration, and CU had an opportunity during

---

**16.** CU also asserts that student athletes have a diminished expectation of privacy with regard to the drug-testing program because they give their consent to the program by signing consent forms that give them full notice of the program. As the trial court found, however, such consents are not voluntary. We recognize that in *Schaill*, 864 F.2d at 1319–20, the court reasoned that even if such a consent is not voluntary, the fact that a student signs a form giving consent significantly diminishes the subjective intrusiveness

of urine testing, but we disagree with this analysis. In our view, once it has been determined that an individual's consent to a drug-testing program is not voluntary for the purposes of the Fourth Amendment, the fact that the government has extracted consent from the individual does not demonstrate that the individual has a diminished expectation of privacy with regard to the program. On the contrary, it shows that the program intrudes on an individual's privacy interest.

closing argument to stress the significance of this evidence for its case. In addition, the trial court heard testimony from several intercollegiate student athletes about what it is like to be a student athlete, and about what it is like to be tested, without individualized suspicion, for possible drug abuse, in CU's random urinalysis-drug-testing program. On the basis of all the evidence before it, the trial court found that "[o]btaining a monitored urine sample is a substantial invasion of privacy," and that CU's random, suspicionless urinalysis-drug-testing of athletes is an "intrusion [that] is clearly significant." [17]

■ We are unaware of any case that holds that the determination of the magnitude of the intrusion of a drug-testing program on the privacy interests of individuals is a factual issue for the trial court to which appellate courts must defer. On the other hand, such a determination, while not a pure question of fact, is certainly one that is dependent upon many facts that can vary from case to case, and therefore a trial court is especially well positioned to assess the magnitude of an intrusion of a drug-testing program on the reasonable privacy expectations of an individual. We therefore owe respectful attention to the trial court's findings and conclusions in this case, and its findings and conclusions in no way support CU's assertion that its drug-testing program does not significantly intrude on the privacy interests of intercollegiate student athletes.

■ Second, it cannot be said that university students, simply because they are university students, are entitled to less protection than other persons under the Fourth Amendment. *See Morale v. Grigel,* 422 F.Supp. 988, 997, 998 (D.N.H.1976) (stating that a "college cannot, in this day and age, protect students under the aegis of *in loco parentis* authority from the rigors of society's rules and laws, just as it cannot, under the same aegis, deprive students of their constitutional rights," and holding that a warrantless search of a student's dormitory room for stolen goods violated the Fourth Amendment even though the purpose of the search was not to obtain criminal evidence); *Collier v. Miller,* 414 F.Supp. 1357, 1359, 1367, 1367 n. 11 (S.D.Tex.1976) (holding unconstitutional a random search, without probable cause, of a Houston University student's purse for alcoholic beverages, bottles, or weapons, as she entered a university pavilion for a rock concert, and explaining that "[t]he defendants do not argue in their brief that a different Fourth Amendment standard should apply to schools, nor would this Court find such an argument meritorious."); *Smyth v. Lubbers,* 398 F.Supp. 777, 786 (W.D.Mich.1975) (holding that adult college students have the same interest in the privacy of their rooms as any adult has in the privacy of his home); 4 Wayne R. La-Fave, *Search and Seizure,* ¶ 10.11(a), at 161–62 (2d ed. 1987) ("Courts have quite properly declined to rely upon the in loco parentis theory in assessing searches conducted on college campuses."); *id.* ¶ 10.-11(c), at 178, 180 ("The reported cases dealing with searches upon college and university campuses reflect the fact that these searches are generally of a different nature than those occurring in high schools," and "it is abundantly clear that there is no basis consistent with established Fourth Amendment doctrine upon which to uphold these [college] searches when made upon less than a full showing of probable cause."); *cf. T.L.O.,* 469 U.S. at 336–37, 105 S.Ct. at 739–40 ("In carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the State, not merely as surrogates for the parents, and they cannot claim the parents' immunity from the strictures of the Fourth Amendment."). In-

---

**17.** The trial court did not elaborate on these findings, except to say:

Elimination of [urine] is a private matter and students subjected to direct observation are very embarrassed and uncomfortable and feel as though their privacy has been invaded. They are resentful that they must be required

to prove that they are abiding by the University's rule against drug use. While the University does not request information other than the presence of the proscribed drugs from the laboratory, urine can reveal a whole host of other personal information such as use of birth control pills.

deed, we note that the representative plaintiff in this case, at the time of trial, was a thirty-one-year-old Army veteran who had served honorably in Europe and Iran,[18] and who had been a member of CU's track and field and cross-country teams in 1986, 1987, and 1988. We therefore find of only marginal relevance holdings by other courts that high school student athletes have a diminished expectation of privacy under the Fourth Amendment, cf. *Schaill*, 864 F.2d at 1319 (concluding that it is "quite implausible that students competing for positions on [a high-school] interscholastic athletic team would have strong expectations of privacy with respect to urine tests"), and we are persuaded that cases that analyze the Fourth Amendment rights of adults in a workplace environment are much more instructive than cases such as *T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, *In re P.E.A.*, 754 P.2d 382 (Colo.1988) (search of a public high school student's car was not unconstitutional), and *Acton v. Vernonia Sch. Dist. 47J*, 796 F.Supp. 1354 (D.Or.1992) (rural public high school's random urinalysis-drug-testing of interscholastic athletes was not unconstitutional), which analyze the Fourth Amendment rights of high school students.[19]

With these two things in mind, we now consider CU's arguments that the magnitude of the intrusion of its drug-testing program on the reasonable expectations of privacy of its student athletes was minimal.

### (a)

CU argues that collection of the urine sample in a closed stall with aural monitoring minimizes any intrusion. We agree that aural monitoring is less intrusive than visual monitoring, but as we have already noted, the trial court found that CU and the other defendants have

> refused to agree that they will not return to the policy which was initially challenged in this class action [i.e., the policy according to which students were visually monitored while providing a urine sample]. In fact, defendants have indicated that there are circumstances under which they would return to that policy.

On certiorari review, it is clear from CU's brief that CU desires that we assume that only aural monitoring is at issue, but at the same time, CU does not challenge the trial court's finding that, in effect, CU might return to a visual monitoring system. In addition, the differences in practice between aural and visual monitoring might not always be so great.[20]

### (b)

CU argues that student athletes' expectations of privacy with regard to urinalysis

**18.** C.R.C.P. 23(a) ("Class Actions") provides that "[o]ne or more members of a class may sue ... as representative parties on behalf of all only if ... the claims ... of the representative parties are typical of the claims ... of the class."

**19.** The court itself in *Acton* questioned whether it would have reached the same result if the high school in question were a large metropolitan school, *id.* at 1365 n. 8, and it specifically distinguished the case before it, on factual grounds, from a case such as *Derdeyn*, 832 P.2d 1031, that involved "college students who have, for the most part, reached the age of adulthood," *Acton*, 796 F.Supp. at 1363 n. 7.

**20.** For example, the trial court heard testimony from one female student who failed to perform adequately on a REE, and who was then required to provide a urine sample under the "aural monitoring" program. She testified that pursuant to that program

> I went to the team house and I went—they have a bathroom in the back behind Dave Burton's office and I had to leave the door open and gave them a urine sample.
> The following exchange then took place:
> Q Who was there outside the room?
> A Terry, [a female trainer,] I believe.
> Q Were you watched while you were providing the sample?
> A No.
> Q How did you feel about the process of someone standing outside while you were providing the sample?
> A It bothered me.
> Q Why?
> A Because it's embarrassing. No one should have to watch someone else pee. It's a private thing, shouldn't be more people in the bathroom. I thought, when I came, I thought it was, you know, they made it seem so minor and it seemed like it was going to be like you go to the doctor and you pee and you put it in a little thing and they open the little door and they take it, you know. The way they made it seem, it didn't seem like it would be that bad until the meeting.

are diminished because they routinely give urine samples as part of an annual, general medical examination, and because they regularly undergo close physical contact with trainers. In this regard, it is true that the United States Supreme Court has recognized that urine tests are less intrusive when the "sample is ... collected in a medical environment, by personnel unrelated to the [employee's] employer, and is thus not unlike similar procedures encountered often in the context of a regular physical examination." *Skinner,* 489 U.S. at 626–27, 109 S.Ct. at 1418–19. Similarly, the Seventh Circuit Court of Appeals has stated that if an individual is required by his job to undergo frequent medical examinations, then that individual will perceive random urinalysis for drug-testing purposes as being less intrusive. *Dimeo,* 943 F.2d at 682. In this case, however, the trial court heard testimony that samples for random urinalysis-drug-testing were not collected in a medical environment by persons unrelated to the athletic program.[21] In addition, many people have an annual physical examination, and the fact that CU's athletes have an annual physical would not seem to put them into *Dimeo*'s category of those who must undergo "frequent" medical examinations. Indeed, the trial court heard testimony from one student athlete that "in that I have never been

injured, I have been lucky and so the only time I saw the trainers was for a urinalysis." [22]

(c)

CU argues that student athletes' expectations of privacy with regard to urinalysis are diminished because they submit to extensive regulation of their on- and off-campus behavior, including maintenance of required levels of academic performance, monitoring of course selection, training rules, mandatory practice sessions, diet restrictions, attendance at study halls, curfews, and prohibitions on alcohol and drug use. In support thereof, CU cites testimony from its athletic director and one student athlete.

CU's athletic director testified in relevant part that the NCAA sets limits on financial aid awards, playing seasons, squad size, and years of eligibility; that the NCAA requires that CU maintain records of each athlete's academic performance; that the "athletes that eat at training tables are football and men's basketball and the other athletes eat in the dorms or at their off-campus residences"; that some coaches within their discretion impose curfews; that athletes are required to show up for practice; that athletes are "advised ... on

**21.** *See, e.g., supra* note 20 and *infra* note 22. In addition, one male student explained as follows the difference between being required to provide a urine sample for drug testing, on the one hand, and undergoing medical treatment or examination, on the other:

When I was treated by the athletic trainers, of course, they at various times touched various part [sic] of my body, that is necessary for treatment. At no time was I required to disrobe for this treatment or required to bear [sic] my genitals. Now, in the question of being observed giving a urine sample, you have direct, exposed genitals to the trainer and the trainer is looking at it and it's considered a private part of my body in my estimation.

The student was then asked, "How was your interaction between you and the trainers, if you did, when they were treating you for an injury as opposed to when they were interacting with you for the purposes of an eye exam or for obtaining a urine sample?" to which he responded:

When the trainers were treating me it was more like I was getting medical treatment and they were, say, some sort of medical personnel who were there to help me. In the instance of the drug testing, it was more like they were a policeman, more like an enforcement type situation and the atmosphere changed from friendly to adversarial.

**22.** That same female student testified:

The restroom was filthy in the training room. The one in Wardenburg was okay but the restroom in the training room was always filthy and you had to do it in front of somebody else and you had to do it in one day. Sometimes my friend and I would be there drinking gallons of water literally after practice trying to go to the bathroom....

and

we had to stay and you had to stay there that first year, you had until 6:00 p.m. to give your sample. It was on Tuesdays and if you couldn't, you would have to stay until you could provide a sample. If you missed that day, then it would be considered a positive.

what they should take for classes"; that "we have a required study hall in the morning and in the evening"; and that it is "fair to say that the athletes are fairly well regulated." A student athlete testified in relevant part that "Yes," "if you are an NCAA athlete, you have to keep a certain grade average," and "Yes," "if your grades drop below that average, then you are not eligible for competition."

Although it is obviously not amenable to precise calculation, it is at least doubtful that the testimony relied upon by CU fully supports CU's assertion that its student athletes are "extensively regulated in their on and off-campus behavior,"[23] especially with regard to all of the particulars that CU asserts. More importantly, none of the types of regulation relied on by CU entails an intrusion on privacy interests of the nature or extent involved in monitored collection of urine samples.

### (d)

CU argues that student athletes' expectations of privacy with regard to urinalysis are diminished because they must submit to the NCAA's random urinalysis-drug-testing program as a condition of participating in NCAA competition. In this regard, CU's athletic director testified that at NCAA championship events, the NCAA conducts random drug testing of athletes as well as testing of the top three finishers and certain starting players, and evidence in the record suggests that NCAA athletes are required to sign consent forms to such testing.

One student athlete testified that he had never been tested at an NCAA event, but that other students were.[24] Another student was asked how she felt about the NCAA testing program, and she answered:

> Again, it was one of those things like I can't believe this. I just competed and something that I looked forward to for years and years and years and they are doing the same intrusive thing that C.U. had but, you know, I was glad to be there and I wasn't going to argue with [it]. The NCAA is a very big [institution] and, you know, I wouldn't know how to fight that. I wouldn't be about to take my team's interests down the tubes because I didn't want to do the urinalysis.

Despite the fact that students might dislike the NCAA drug-testing program, it seems that they must consent to it in order to be NCAA athletes, and submission to one such program could reduce the intrusiveness of having to submit to another. On the other hand, the trial court heard testimony suggesting that part of what is intrusive about the CU program is that it transformed what might otherwise be friendly, trusting, and caring relations between trainers and athletes into untrusting and confrontational relations.[25]

### (e)

CU argues that student athletes' expectations of privacy with regard to urinalysis

---

**23.** Under the third amended program, "athlete" includes "cheerleaders, student trainers and student managers." CU cites nothing in the record that suggests that these athletes are also extensively regulated on and off campus.

**24.** There is nothing in the record to suggest that cheerleaders, student trainers or student managers are subject to the NCAA drug testing program. See *supra* note 23.

**25.** Specifically, CU's athletic director testified that a "common" and "accurate" way to describe the relationship between "the trainers and their athletes" is that they are "friend[s]." He also testified that the trainers take care of "the overall general wellbeing of the athlete and I think not only physically but I think also mentally."

However, in describing her relation with a trainer after she had tested positive and was called in the next day for retesting (which turned out negative), one athlete testified "we [the trainer and I] are friends but it was confrontational. It was an untrusting—I felt that they were considering me untrustworthy." When asked how her relationship with the trainers changed thereafter, she answered:

> Well, probably from bad to worse. We did not dislike each other, it's just it made all the feelings even more so, all the feelings. It is confrontational. Everytime I come to the training room, I have to prove my innocence and it was just double that.

The athlete also testified that no one ever explained to her how it was that the first test came back positive.

are diminished because the consequences of refusing to provide a urine sample are not severe. We appreciate that in comparison to losing one's job, as would be the consequence in some government employee/drug-testing cases, *e.g.*, *Bostic v. McClendon*, 650 F.Supp. 245, 249 (N.D.Ga. 1986), not being able to participate in intercollegiate athletics can be regarded as less of a burden. It is, to be sure, only a very small percentage of college athletes whose college "careers" are essential as stepping stones to lucrative contracts—or to any contract—as professional athletes. On the other hand, however, we must also recognize that many intercollegiate athletes who otherwise could not afford a college education receive athletic scholarships that enable them to obtain a college degree and thereby increase their earning potential. Continuation of such scholarships at CU is dependent upon continued participation in the intercollegiate athletic program, which in turn requires consent to the drug-testing program. Furthermore, many intercollegiate athletes pursue professional careers as high school or college coaches, or as administrators in athletic or recreational programs. Thus, for example, one student athlete who graduated from CU by the time of the trial testified that she worked as a track coach at CU. Another testified that she just recently obtained employment coaching girls' volleyball and basketball at a local high school. While having participated in intercollegiate athletics may not be a formal requirement for such jobs, it is commonplace that applicants with experience at the intercollegiate athletic level will not be disadvantaged in seeking such jobs in comparison with those who lack such experience. Also, we recognize that for many student athletes, participation in intercollegiate athletics is an activity highly valued for its own sake. We therefore believe that the consequences of not being able to participate in intercollegiate athletics must be accorded significant weight.

(f)

Finally, CU argues that student athletes' expectations of privacy with regard to urinalysis are diminished because positive test results are confidential and are not used for the purposes of criminal law enforcement. It is true that an intrusion by the government outside the context of criminal law enforcement is generally less of an intrusion than one for the purposes of law enforcement. However, as a matter of law, we already take this fact into account when we analyze this case according to the standards of cases like *Skinner* and *Von Raab*, rather than according to the standards of typical cases in the area of criminal procedure where there are very few and well defined exceptions to the requirement of a warrant based on probable cause. In other words, were we to attribute less weight to the students' privacy interests because this is not a criminal case, and also start with the premise that *Skinner* and *Von Raab* control, we would be, in effect, giving double weight in our analysis to the fact that we are not dealing with an issue in criminal procedure. Consequently, the fact that this is not a criminal matter adds nothing to what we must balance at this point in our analysis. Furthermore, as we have already indicated, CU does not in its written descriptions of its drug-testing programs give any significant specific or general assurances that test results are confidential.[26] There is no evidence at all that CU has ever made available, or ever desired to make available, to the general public any student's urine test results, but the list of people to whom students must consent to the release of drug-test information is substantial, and we are particularly uncertain as to the significance of the fact that in CU's third amended program students must consent to the release of information to "my work supervisor (if applicable)."[27]

26. In its third amended program, CU does state that communications between an athlete and physicians at Wardenburg Student Health Center shall be confidential. Given that the physician/patient communications are normally con-fidential, we do not perceive this as a "significant specific or general assurance" of confidentiality of test results.

27. CU also asserts in its brief that because "the locker room partakes of an element of 'commu-

(g)

Having reviewed the record in light of each of CU's assertions, it is clear that in some places CU seems to overstate its case, while in others, it has a valid point. On balance, however, we are in full agreement with the conclusion of the trial court that CU's random, suspicionless urinalysis-drug-testing of athletes is an "intrusion [that] is clearly significant."

2

CU asserts several interests in maintaining its drug-testing program. These interests are preparing its athletes for drug testing in NCAA championship events, promoting the integrity of its athletic program, preventing drug use by other students who look to athletes as role models, ensuring fair competition, and protecting the health and safety of intercollegiate athletes.[28]

We begin our consideration of these interests by observing that suspicionless urinalysis-drug-testing by the government has been upheld in numerous cases, and in many of those cases, courts have characterized the relevant government interests as "compelling." *E.g., Skinner*, 489 U.S. at 628, 109 S.Ct. at 1419 (government has "compelling" interest in testing railroad employees whose "duties [are] fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences"); *Von Raab*, 489 U.S. at 670, 109 S.Ct. at 1393 (government has "compelling interest in ensuring that front-line [drug] interdiction personnel [in the United States Customs Service] are physically fit, and have unimpeachable integrity and judgment"); *id.* at 677, 109 S.Ct. at 1396 (government has a compelling interest in protecting truly sensitive information from those who might compromise such information); *id.* at 679, 109 S.Ct. at 1398 (government has "compelling interests in preventing the promotion of drug users to positions where they might endanger the integrity of our Nation's borders or the life of the citizenry"); *Cheney*, 884 F.2d at 610 (government has a "compelling safety interest in ensuring that the approximately 2,800 civilians who fly and service its airplanes and helicopters are not impaired by drugs").[29]   However,

---

nal undress,'" the athletes challenging CU's drug testing program have diminished expectations of privacy. We find nothing, however, in the characterization of a locker room as partaking of an element of communal undress that suggests that student athletes would not be offended by the intrusion of being called upon to perform monitored urination for a drug test. For example, the trial court heard testimony from two female athletes that they were not called in from a state of "communal undress" for their random tests, but from the privacy of their homes:

Well, I had never liked the program and what happened was—and that was in the fall of 1987, my fourth year, I got called on Tuesday night and it was 7:00 and I was in my pajamas and studying and it was Terry Brown who said I had to come down at that instant to do a test, a urinalysis test.

. . . . .

And I had an exam the next morning and if I didn't come in at that point, I would have a positive and so I had to go in and I didn't have a car....

and

A   Yes, I was home in Longmont one day and they called my house and said you are on the eye list, would you please come and give us—you have to come in and test.

Q   How was it that you hadn't seen the list or been able to look at the list?

A   Because I was at home. I had a class early and I think it was like Friday or something and I didn't have to go to practice. I didn't have to be supervised, go to a supervised practice so I was home and they called me and I had to come in from Longmont.

In addition, CU's third amended program defines "athletes" to include cheerleaders, student trainers, and student managers, and although student trainers and student managers must be accustomed to a locker room, it is not obvious to us that any of these three categories of persons must participate in the communal undress. Finally, the record is silent on whether locker room conditions are the same for all intercollegiate sports.

**28.**   CU has not asserted any financial interest in maintaining its drug-testing program. *Cf. Dimeo*, 943 F.2d at 685 (state asserted a "substantial ... financial interest" in random drug testing of professional jockeys, starters, and outriders).

**29.**   We do not include in this list of examples the district court's opinion in *O'Halloran v. University of Washington*, 679 F.Supp. 997, 1002, 1007 (W.D.Wash.1988) (finding that the NCAA and

the Supreme Court has not held that only a "compelling" interest will suffice, *see Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417; *cf. Von Raab*, 489 U.S. at 666, 109 S.Ct. at 1391, and some courts have upheld suspicionless urinalysis-drug-testing by the government without finding a compelling interest. *E.g., Dimeo*, 943 F.2d at 681, 683, 685 (explaining that decreasing levels of intrusiveness require decreasing levels of government justification, declining to characterize as compelling the government's interest in protecting professional jockeys, starters, and outriders from injuring one another at the race track, characterizing the state's financial interest as "substantial," and holding that these two interests outweigh "the very limited privacy interest[s]" of professional jockeys, starters, and outriders); *International Bhd. of Elec. Workers, Local 1245 v. Skinner*, 913 F.2d 1454, 1462, 1463, 1464 (9th Cir.1990) (finding that the government has a "great" interest in the safety of the natural gas and hazardous liquid pipeline industry, and holding that this "strong" interest is sufficient to justify random urinalysis testing of pipeline workers). Hence, rather than trying to characterize CU's interests as "compelling," "strong," "substantial," or of some lesser degree of importance, we think it is more instructive simply to compare them with other types of commonly asserted interests that have been held sufficient or insufficient to justify similar intrusions.

Our review of the cases in this area supports the conclusion of the Ninth Circuit Court of Appeals in *Local 1245 v. Skinner*, a case involving a program for random drug testing of employees, absent individualized suspicion, that "the concern for public safety animates the general acceptance of drug testing by courts." *Local 1245 v. Skinner*, 913 F.2d at 1462 (citing as support for this proposition *Skinner, Von Raab*, and cases from the Third, Fourth, Eighth, and District of Columbia Circuits); *see also O'Keefe v. Passaic Valley Water Comm'n*, 253 N.J.Super. 569, 602 A.2d 760, 763 (A.D.1992) (reading *Skinner* and *Von Raab* as holding that "the government may nevertheless require drug testing [absent reasonable suspicion] without running afoul of the proscriptions of the Fourth Amendment in those circumstances in which the government's special and compelling need to protect the public safety outweighs the employee's privacy interest"). For example, courts have upheld suspicionless urinalysis-drug-testing of Army-employed civilian air traffic controllers, pilots, aviation mechanics, aircraft attendants, police, and guards, *Cheney*, 884 F.2d at 610–11, 612–13; civilian employees of a chemical weapons plant who "have access to areas ... in which experiments are performed with highly lethal chemical warfare agents," *Thomson v. Marsh*, 884 F.2d 113, 114 (4th Cir.1989) (per curiam); drivers, mechanics and attendants whose primary duty is the daily transportation of handicapped children on school buses, *Jones v. Jenkins*, 878 F.2d 1476, 1477 (D.C.Cir.1989) (per curiam), *modifying Jones v. McKen-*

the University of Washington have a "compelling interest ... in protecting the health of student-athletes, reducing peer pressure and temptations to use drugs, ensuring fair competitions for student-athletes and the public, and educating about and deterring drug abuse in sports competition" and concluding that these interests outweigh the privacy interests of student athletes), *rev'd, O'Halloran v. University of Washington*, 856 F.2d 1375, 1381 (9th Cir.1988) (remanding "the action to the district court with directions that that court remand the entire case back to the state court from which it was removed" because "the district court did not have subject matter jurisdiction over the third-party complaint and removal was improper"), for several reasons. First, and most obvious, the district court lacked subject matter jurisdiction. Second, *O'Halloran*, 679 F.Supp. 997, was issued before *Skinner* and *Von Raab* were decided. Third, and perhaps more important, the issue presented in *O'Halloran*, 679 F.Supp. 997, was the constitutional validity of the NCAA's drug-testing program and the University of Washington's participation in it, *id.* at 998, as opposed to any program conducted by the University of Washington. In this regard, the district court held that the University of Washington's participation in the NCAA program did not constitute state action, and that the NCAA is not a state actor. *Id.* at 1002. Thus, the court's discussion of the "government's" compelling interests and the privacy interests of intercollegiate athletes is dicta, and it does not appear that the NCAA's intrusion upon the privacy of athletes at NCAA championship competitions is as severe as a university's intrusion on its own athletes.

*zie,* 833 F.2d 335 (D.C.Cir.1987); bus or commercial truck drivers who operate "enormous" trucks such that "a single mistake in judgment or momentary lapse in attention can have devastating consequences for other travelers," *International Bhd. of Teamsters v. Department of Transp.,* 932 F.2d 1292, 1304 (9th Cir.1991); "scrub techs" in public hospitals whose duties include bringing patients to the operating room, setting up the sterile field, laying out the proper instruments, and assisting during surgery, *Kent v. Claiborne County Hosp.,* 763 F.Supp. 1362, 1364, 1367 (S.D.Miss.1991); employees holding top secret national security clearances, *Harmon v. Thornburgh,* 878 F.2d 484, 491–92 (D.C.Cir.1989); county correctional employees with regular access to prisoners or weapons, *Taylor v. O'Grady,* 888 F.2d 1189, 1199, 1201 (7th Cir.1989); and police officers who carry firearms or participate in drug interdiction efforts, *Guiney v. Roache,* 873 F.2d 1557, 1558 (1st Cir.1989) (per curiam). At the same time, courts have found insufficient governmental interests to uphold suspicionless urinalysis-drug-testing of high-school students who participate in extracurricular activities, *Brooks,* 730 F.Supp. at 764–66; United States Department of Justice employees who are prosecutors in criminal cases and other employees who have access to grand jury proceedings, *Harmon,* 878 F.2d at 496; county correctional employees who have no reasonable opportunity to smuggle narcotics to prisoners and no access to firearms, *Taylor,* 888 F.2d at 1201; civilian laboratory workers at the Army's forensic Drug Testing Laboratories, *Cheney,* 884 F.2d at 613, 615; civilian employees in the chain of custody process for biochemical testing at the Army's forensic Drug Testing Laboratories, *id.;* and water meter readers who must enter customers' homes in order to read the meters, *O'Keefe,* 602 A.2d at 764. In addition, courts have questioned the propriety of suspicionless testing of secretaries, engineering technicians, research biologists, and animal caretakers who work at chemical and nuclear facilities, *Cheney,* 884 F.2d at 611; police department personnel who do not carry firearms or participate in drug interdiction efforts, *Guiney,* 873 F.2d at 1558; heads of purchasing departments in hospitals who have "vital and important responsibility essential to the proper supply of medical materials," *Kemp v. Claiborne County Hospital,* 763 F.Supp. 1362, 1367 (S.D.Miss.1991); and United States Customs Service employees who are required to handle classified material, *Von Raab,* 489 U.S. at 677, 109 S.Ct. at 1396.

CU asserts no significant public safety or national security interests.[30] This is not by itself dispositive, but absent a showing by CU that its athletes have a greatly diminished expectation of privacy or that its program is not significantly intrusive, the great majority of cases following *Skinner* and *Von Raab* clearly militate against the conclusion that CU's program is a reasonable exercise of state power under the Fourth Amendment. This is so despite the fact that CU's interest in protecting the health and safety of its intercollegiate athletes, like its interest in protecting all of its students, is unquestionably significant.

We have not been persuaded that CU's athletes have a greatly diminished expectation of privacy, nor are we persuaded that CU's program is not significantly intrusive. In addition, we question whether some of the interests asserted by CU are even significant for Fourth Amendment purposes. For example, although the integrity of its athletic program is, like all the other interests asserted by CU, a valid and commendable one, it does not seem to be very significant for Fourth Amendment purposes. *See Local 1245 v. NRC,* 966 F.2d at 525 n. 9 (In evaluating a program for random drug testing of employees absent individualized suspicion, the court said, "The NRC wisely decided to refrain from pursuing its

---

**30.** The possible exception is preventing drug use by other students who look to athletes as role models. However, CU presented no evidence that other CU students look to its athletes as role models, nor did CU present any evidence that its

program, by deterring drug use among its athletes, has deterred drug use among its general student population. Absent any such evidence in the record, this possible public safety concern is purely speculative.

integrity of the workforce rationale on appeal. This rationale has almost uniformly been rejected by the courts as insufficient to justify drug testing of employees."); *O'Grady,* 888 F.2d at 1196. Similarly, although the promotion of fair competition builds character in athletes and enhances the entertainment value of athletic events, CU does not explain why the promotion of fair competition is itself an important *governmental* interest, just as it does not explain why preventing the disqualification of its athletes at sporting events is an important *governmental* interest.

We therefore hold, based on a balancing of the privacy interests of the student athletes and the governmental interests of CU, that CU's drug-testing program is unconstitutional under the Fourth Amendment. More specifically, we hold that random, suspicionless urinalysis-drug-testing by CU of student athletes is unconstitutional under the Fourth Amendment if that testing is conducted according to the procedures utilized in any of CU's drug-testing programs to the date of trial, or if that testing is conducted in a manner substantially similar to any of the procedures utilized in any of CU's drug-testing programs to the date of trial. Furthermore, because the Colorado Constitution provides at least as much protection from unreasonable searches and seizures as does the Fourth Amendment, CU's drug-testing program is also unconstitutional under Article II, Section 7, of the Colorado Constitution.

### B

CU asserts, however, that even if its drug-testing program is not otherwise constitutionally reasonable, there is no constitutional violation because its student athletes voluntarily consent to testing. We next address that argument.

■ A warrantless search of an individual is generally reasonable under the Fourth Amendment if the individual has voluntarily consented to it. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 222, 93 S.Ct. at 2041, 2043, 2044, 36 L.Ed.2d 854 (1973). A voluntary consent to a search is "a consent intelligently and freely given, without any duress, coercion or subtle promises or threats calculated to flaw the free and unconstrained nature of the decision." *People v. Carlson,* 677 P.2d 310, 318 (Colo. 1984) (citing *Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041 and *People v. Helm,* 633 P.2d 1071 (Colo.1981)). Whether consent to a search was voluntary "is a question of fact to be determined from all the circumstances...." *Bustamonte,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *accord United States v. Wright,* 932 F.2d 868, 878 (10th Cir.1991) ("Whether a search was voluntary is a question of fact to be determined by the district court from the totality of the circumstances."); *Carlson,* 677 P.2d at 318 ("Voluntariness is a question of fact to be determined from the totality of circumstances;"). The government has the burden of proving that consent to a search was voluntarily given, *Bustamonte,* 412 U.S. at 222, 93 S.Ct. at 2045; *People v. Savage,* 698 P.2d 1330, 1334 (Colo.1985); *Carlson,* 677 P.2d 310, 318, and we must defer to the trial court's findings on the factual issue of voluntariness unless its findings are clearly erroneous, *Wright,* 932 F.2d at 878; *United States v. Corral,* 823 F.2d 1389, 1393 (10th Cir.1987), or not supported by the record, *People v. Lowe,* 616 P.2d 118, 124 (Colo.1980); *see Carlson,* 677 P.2d at 318.

The trial court heard specific direct testimony from several intercollegiate student athletes who described how and when they were presented with consent forms to sign, and why they signed them. CU had the opportunity to cross-examine these students, and to present direct testimony of its own. The intercollegiate student athlete who testified on behalf of CU was not asked about how or when she was told of the drug-testing program, how or when she was presented with a consent form to sign, or why she signed the form. The Athletic Director for CU and CU's Head Athletic Trainer testified in general about how and when intercollegiate student athletes are notified about the drug-testing program, although neither testified about how and when the students are actually presented

with consent forms to sign.[31]

On the basis of this evidence, the trial court concluded:

> The evidence produced during this trial failed to establish that the consents given by the University's student-athletes are voluntary. It is quite clear that they are "coerced" for constitutional purposes by the fact that there can be no participation in athletics without a signed consent. As in the cases cited,[32] the "consent" obtained by the University is not voluntary....

CU argues that this should not be understood as a factual finding by the trial court, but as an erroneous legal conclusion based improperly on the "unconstitutional conditions" doctrine of *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).[33] In light of the language used by the trial court, and the authority that it cites, we are persuaded that the trial court did make a factual finding on the issue of voluntary consent, and that the trial court, as an alternative ground for its decision, also applied the doctrine of unconstitutional conditions.

The trial court reasoned as follows:

> It is the duty of the government to "demonstrate that the consent was in fact voluntarily given and not the result of duress or coercion, express or implied. Voluntariness i[s] a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49 [93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854] (1973).

The fact that participation in intercollegiate sports is not a "right" but a "benefit" does not alter the requirement that any consent be voluntary. The Supreme Court has acknowledged that

> Though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interest.... For if the government could deny a benefit to a person because of his [exercise of] constitutionally protected [rights], his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which it could not command directly. Such interference with constitutional rights is impermissible. *Perry v. Sinderman[n],* 408 U.S. 583, [593] 597 [92 S.Ct. 2694, 2697, 33 L.Ed.2d 570] (1972).

It is quite clear that no consent can be voluntary where the failure to consent results in a denial of the governmental benefit. *Bostic v. McClendon,* 650 F.Supp. 245 (N.D.Ga.1986) ("Consent" by city clerk's office and police personnel to urinalysis testing was not voluntary where employment would have been terminated if personnel refused to participate); *Feliciano v. City of Cleveland,* 661 F.Supp. 578 (N.D.Ohio 1987) (Police

---

**31.** CU's Athletic Director testified that "at the initial team meeting, the athletes all sign the NCAA forms and consent to the NCAA [drug] testing at the championship events." The record indicates, however, that the NCAA drug-testing program is separate from CU's drug-testing program, and that each program uses separate consent forms. The evidence from the student athletes suggests that consent forms are signed after the initial team meetings and that such meetings are held at the beginning of each academic year.

**32.** In the immediately preceding paragraph the trial court cited *Schaill,* 864 F.2d 1309, *Feliciano v. City of Cleveland,* 661 F.Supp. 578 (N.D.Ohio 1987), *American Federation of Government Employees v. Weinberger,* 651 F.Supp. 726 (S.D.Ga.

1986), and *Bostic v. McClendon,* 650 F.Supp. 245 (N.D.Ga.1986).

**33.** CU has not been entirely consistent in its position on this issue before this court. In its opening brief it argued that after resolving the unconstitutional conditions question, "[t]he question remains whether the University's program provides for voluntary, knowing, and intelligent consent, which must be tested by the totality of the circumstances." In its reply brief, however, CU argues that we should confine our attention to the unconstitutional conditions issue, and appears to base the argument on the contentions that this was the only issue addressed by the trial court and that the manner in which the issues were framed in our grant of certiorari should limit our review.

academy cadets did not voluntarily consent to urinalysis for drug testing where cadets believed that producing urine samples was necessary to retain their jobs); *American Federation of Gov. Employees v. Weinberger*, 651 F.Supp. 726 (S.D.Ga.1986) (Because signed consent to Department of Defense mandatory urinalysis drug testing was given only because jobs would be lost if consent forms were not signed, the "consent" obtained was not voluntary); *Schaill by Kross v. Tippecanoe County School Corp.*, 864 F.2d 1309 (7th Cir.1988) ("Consent" by high school student-athletes to drug testing not effective as consent because participation in urinalysis testing was required for participation in interscholastic athletics).

The evidence produced during this trial failed to establish that the consents given by the University's student-athletes are voluntary. It is quite clear that they are "coerced" for constitutional purposes by the fact that there can be no participation in athletics without a signed consent. As in the cases cited, the "consent" obtained by the University is not voluntary. . . .

In *Bostic* and *Feliciano*, the trial courts applied the "all the circumstances" test articulated in *Bustamonte*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59, and found as a matter of fact that the respective plaintiffs' consent to urinalysis-drug-testing was not voluntary. *See Feliciano*, 661 F.Supp. at 593–95;[34] *Bostic*, 650 F.Supp. at 249. In *Weinberger*, the trial court relied on *Bustamonte* and found as a matter of fact that certain individuals did not voluntarily consent to urinalysis-drug-testing; in addition, the trial court applied the doctrine of unconstitutional conditions and held that consent to such testing was not a valid condition of government employment and could not have effected a waiver of the plaintiffs' rights under the Fourth Amendment. *Weinberger*, 651 F.Supp. at 736. In *Schaill*, a panel of the Seventh Circuit

Court of Appeals quoted from *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, and seemed to hold as a matter of law that high school students cannot give valid consent to random drug testing if the giving of such consent is a condition of their being able to participate in interscholastic athletics. *Schaill*, 864 F.2d at 1312–13.

Hence, in deciding the issue of "voluntary consent," the trial court cited *Bustamonte* and *Sindermann*. Then it relied on two cases (*Bostic* and *Feliciano*) in which trial courts found as a matter of fact under *Bustamonte* that the certain individuals did not voluntarily consent to urinalysis-drug-testing; one case (*Weinberger*) in which the trial court found as a matter of fact under *Bustamonte* that certain individuals did not voluntarily consent to urinalysis-drug-testing, and in addition, that consent to such testing was not a valid condition of government employment and could not have effected a waiver of the plaintiffs' rights under the Fourth Amendment; and one case (*Schaill*) that applied the doctrine of unconstitutional conditions and seemed to hold that high school students cannot give valid consent to random drug testing if such consent is a condition of their being able to participate in interscholastic athletics. We therefore are persuaded that the trial court, like the trial court in *Weinberger*, decided the issue of "voluntary consent" on alternative grounds. Specifically, the trial court found as a matter of fact under *Bustamonte* that "the evidence produced during this trial failed to establish that the consents given by the University's student-athletes are voluntary." In the alternative, the trial court relied on the doctrine of unconstitutional conditions and held that no consent can be voluntary under the Fourth Amendment where the failure to consent results in a denial of a government benefit such as participation in intercollegiate sports at a state university.

---

**34.** *Feliciano v. City of Cleveland*, 988 F.2d 649 (6th Cir.1993), which did not reach any Fourth Amendment issue, *id.* at 654 n. 3, reports that *Feliciano*, 661 F.Supp. 578, was vacated by the district court in an unpublished order on December 14, 1989. *Feliciano*, 988 F.2d at 653. The trial court in this case issued its order on August 22, 1989.

We therefore must determine whether the record supports the trial court's finding that CU failed to carry its burden of proving that the consents to search that are at issue in this case are voluntary. In this connection, it must be remembered that this is a class action. Such an action is based on the premise that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." C.R.C.P. 23(a)(3). The class members consist of both present and prospective student athletes. *See supra* note 9. Therefore, although it may initially appear anomalous that the consent issue could be decided as to future student athletes or on other than an individualized basis, the case was tried on the premise that the procedures for obtaining consents are standard components of the drug-testing program and are uniform. That is not to say that there are not variations in procedures dependent upon the times the students approach or are approached by CU, but rather that in each given situation a potential student athlete is advised of the drug program and solicited to consent in essentially standard ways. Thus, the procedures routinely followed in implementation of the drug-testing program, as applied to student athletes typified by those who testified at trial, are what are truly at issue in determining the voluntariness of consent. Consistent with this analysis, in its opening brief in this court, in which CU recognizes that "whether the University's program provides for voluntary, knowing, and intelligent consent" is a question to be resolved, *see supra* note 33, CU makes no argument that individualized determinations are required or that consent cannot be determined with respect to future students. Our review of the trial court's ruling on voluntariness of consent to search must be conducted with the foregoing framework in mind.

It is clear from the record that a student will be denied the opportunity to participate in CU's intercollegiate athletic program in absence of execution of a signed consent. It is equally clear that no athletic scholarship will be available to a student who does not consent to drug testing. The pressure on a prospective student athlete to sign a consent to random, suspicionless drug testing under such circumstances is obvious.

The record suggests that consents are signed following team meetings at some time around the beginning of the academic year. Prospective student athletes recruited by CU are advised of the drug-testing program in a general way early in their contacts with CU and with specificity prior to being asked to sign consents. The record does not reflect whether the prospective student athletes are given information at a time when they have a meaningful opportunity to apply for admission to another educational institution or for acceptance into an athletic program of such an alternative institution.[35] There is nothing in the record to suggest that prospective student athletes are advised that CU may elect to revert to its former procedures of visually monitoring the collection of urine samples.

It must be remembered that the consent in question is the consent to an otherwise unconstitutional search, and that to be voluntary such a consent must be "freely given, without any duress, coercion or subtle promises or threats calculated to flaw the free and unconstrained nature of the decision." *People v. Carlson*, 677 P.2d at 318 (citing *Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, and *People v. Helm*, 633 P.2d 1071). We conclude that the record supports the trial court's finding that CU failed to bear its burden to prove that consents obtained pursuant to its random, suspicionless urinalysis-drug-testing program for the certified class of intercollegiate student athletes are voluntarily given. We accordingly hold that for the purposes of the Fourth Amendment and Article II, Section 7, of the Colorado Constitution, CU's intercollegiate stu-

---

35. One student athlete testified that to transfer to another school after accepting an athletic scholarship results in a one-year loss of eligibility for participation in intercollegiate athletics.

dent athletes do not voluntarily consent to being searched pursuant to the drug-testing program.[36]

## III

For the foregoing reasons, we affirm the judgment of the court of appeals.[37]

**36.** Because we uphold the trial court's finding that CU failed to prove voluntary consent, it is unnecessary and inappropriate for us to consider whether the trial court reached a legally correct result under the doctrine of unconstitutional conditions. *See Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996, 86 L.Ed.2d 664 (1985) (" '[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.' ") (quoting *Spector Motor Co. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944)); *People v. Lybarger,* 700 P.2d 910, 915 (Colo.1985) ("Axiomatic to the exercise of judicial authority is the principle that a court should not decide a constitutional issue unless ... the necessity for such decision is clear and inescapable."). We therefore express no opinion on whether, in theory, it is ever possible for university students voluntarily to consent under the Fourth Amendment, or under Article II, Section 7, to a drug-testing program if consent to that program is a condition of their ability to participate in intercollegiate athletics. The trial court unnecessarily addressed this issue.

We do note, however, that the result reached by the trial court finds support in the analyses of writers who have endeavored to reconcile the numerous and difficult cases found in this area of the law. *See* Lynn A. Baker, *The Prices of Rights: Toward a Positive Theory of Unconstitutional Conditions,* 75 Cornell L.Rev. 1185, 1197–1212 (1990) (analysis of 23 United States Supreme Court opinions applying the doctrine of unconstitutional conditions); Sally Lynn Meloch, Note, *An Analysis of Public College Athlete Drug Testing Programs Through the Unconstitutional Condition Doctrine and the Fourth Amendment,* 60 S.Cal.L.Rev. 815, 826–35, 849–50 (1987) (analysis of 7 United States Supreme Court opinions applying the doctrine of unconstitutional conditions). These writers conclude directly, *see* Meloch, *supra,* at 835, and indirectly, *see* Baker, *supra,* at 1203–04, that whether a state university such as CU has unconstitutionally conditioned the benefit of participation in intercollegiate athletics would depend on a balancing of the same factors that are germane to determining whether CU's program is reasonable under the Fourth Amendment without the voluntary consent of its students, specifically, the magnitude of the governmental interests involved and the degree to which the program burdens the privacy interests of the athletes.

Chief Justice ROVIRA dissenting:

For purposes of this case, I will assume that nonconsensual, random, suspicionless urinalysis-drug-testing of student athletes is unreasonable under the Fourth Amendment, in spite of the Supreme Court's approval of suspicionless drug testing in other contexts. *See Skinner v. Railway La-*

*See also Schaill,* 864 F.2d at 1312–13 (suggesting that high school students could not under the Fourth Amendment give valid consent to random drug testing if the giving of such consent is a condition of their being able to participate in interscholastic athletics and if the testing otherwise would constitute an illegal search).

We further note that the principal case relied upon by CU for its interpretation of the doctrine of unconstitutional conditions, specifically, *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (recipient of Aid to Families with Dependent Children public assistance benefits could not refuse a home visit by a social worker without risking the termination of benefits), does not support that interpretation for several reasons. First, *Wyman* held that the home visit in question was so unintrusive that it was not even a search under the Fourth Amendment, *id.* at 317, 91 S.Ct. at 385, whereas random, monitored urinalysis-drug-testing is obviously a search. Second, the governmental interests at stake in *Wyman* were the compelling *parens patriae* governmental interest in protecting the well-being of young, dependent children, *id.* at 316, 318, 322 n. 9, 91 S.Ct. at 385, 386, 388 n. 9, and the substantial governmental interest in making sure that tax dollars are appropriately spent and not wasted either through welfare fraud or otherwise, *id.* at 318–19, 91 S.Ct. at 386–87. No similar interests are implicated in this case. Third, *Wyman* held that even if the home visit were a search, it was reasonable. Thus, while *Wyman* reached in dicta the issue of whether the government may condition a benefit on consenting to a search that is reasonable, this is a different issue than whether the government may condition a benefit on a search that is unreasonable without the beneficiaries' consent, and it is the latter issue that is implicated in this case, *see supra* part IIB.

The trial court permanently enjoined CU "from requiring any urine samples from student athletes for the purposes of drug testing...." In view of our conclusion that it was unnecessary to address the unconstitutional conditions issue, we recognize the possibility that in the future CU might be able to devise a program involving truly voluntary consents to drug testing. In such event, CU is free to apply for modification or dissolution of the injunction.

**37.** In so doing, we express no opinion on the correctness of the court of appeals' holding that objective, reasonable, individualized suspicion of drug use could in some circumstances warrant mandatory drug testing of intercollegiate athletes by CU. *See supra* at 935.

*bor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). I write separately because the majority has misconstrued the basis for the trial court's ruling concerning the question of voluntariness in such a way that, if accepted, would be undeserving of this court's deference. Maj. op. at 946–949. Additionally, I believe that when properly construed, the trial court's ruling should be reversed on the basis of the unconstitutional conditions doctrine—application of which is plainly necessitated by the nature of the class which originally brought this suit. Accordingly, I respectfully dissent.

I

The trial court, in rendering its ruling, stated that

[t]he evidence produced during this trial failed to establish that the consents given by the University's student-athletes are voluntary. It is quite clear that they are "coerced" for constitutional purposes by the fact that there can be no participation in athletics without a signed consent. As in the cases cited, the "consent" obtained by the University is not voluntary....

The majority finds that this ruling is based on "alternative grounds," and concludes that the trial court's factual finding concerning the question of voluntariness is itself sufficient to sustain the trial court's ruling. Maj. op. at 948–950. Accordingly, the majority declines to opine "whether, in theory, it is ever possible for university students voluntarily to consent under the

Fourth Amendment, or under Article II, section 7, to a drug-testing program if consent to that program is a condition of their ability to participate in intercollegiate athletics." *Id.* at 950 n. 36.

The question of the voluntariness of consent for purposes of the Fourth Amendment is a question of fact which is to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973); *People v. Carlson,* 677 P.2d 310, 318 (Colo.1984). Thus, in reviewing the trial court's finding that "[t]he evidence produced during this trial failed to establish that the consents given by the University's student-athletes are voluntary," we defer to the trial court unless its finding is clearly erroneous or not supported by the record. *See* maj. op. at 946 (and authority cited therein).

The trial court was not, for obvious reasons, presented with any evidence by prospective student athletes concerning the voluntariness of consent to random drug testing which has not yet been given.[1] No student athletes who are considering attending the University of Colorado ("CU") and also considering "consenting" to CU's drug-testing program testified; no individual who may become a student athlete testified regarding the voluntariness of consent which may be given if that individual becomes an athlete of intercollegiate caliber and then attends CU and is then informed about CU's drug-testing program. In short, the only evidence presented to the trial court concerning the voluntariness of consent pertained, as logic requires, to "consents given" by actual CU student athletes. No evidence was, nor could it con-

---

1. The plaintiff class consists of both present and prospective student athletes. Pursuant to C.R.C.P. 23, the plaintiff class was certified as follows:

Those present and prospective undergraduate student athletes who are or will be subject to the University of Colorado intercollegiate athletic department's drug education program as a condition of participation in the University of Colorado intercollegiate athletic program limited as follows: Those present undergraduate student athletes who have never tested positive or have been subject to discipline or

sanction as a result of a positive test result; and those present student athletes, who, although having executed waivers, consents or agreements to participate in the University of Colorado's drug education program, object to the program as being an unconstitutional condition of participation; and lastly, those prospective undergraduate student athletes who will execute waivers, consents or agreements to participate in the University of Colorado's drug education program, but who object to the program as being an unconstitutional condition of participation.

ceivably be, presented regarding whether consent to drug testing—which has not yet been given—was given voluntarily as a matter of fact.

Moreover, the fact that "the procedures for obtaining consents are standard components of the drug-testing program and are uniform," maj. op. at 949, in no way alters the conclusion that no evidence was presented regarding the voluntariness of consents which have yet to be given, because governmental conduct is not the sole fact to be considered in applying the totality of the circumstances test set forth in *Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041.

To the contrary, the totality of the circumstances test, as applied in this case, clearly requires that the level of coercion which is brought to bear on individual student athletes must be taken into account. The impossibility of determining, as a factual matter, the question of voluntariness with respect to this entire class is due, in part, to the fact that the relative degree of coercion will vary among individuals depending on their circumstances. For example, while the pressure imposed on a scholarship-dependent student may be obvious, the same cannot be said of the student who is not dependent on financial assistance in order to attend college but who is nevertheless required to consent to CU's drug-testing program. Similarly, the pressure that may be brought to bear on a heavily recruited individual who essentially has the "pick of the crop" in terms of which college institution to attend, would clearly be less than an aid-dependent student whose only

opportunity to attend college on an athletic scholarship may be to accept the conditions which CU attaches to such attendance. Consequently, I disagree with the majority's conclusory statement that if participation in athletics and receipt of an athletic scholarship are conditioned on a student's consent to drug testing, then "[t]he pressure on a prospective student athlete to sign a consent to random, suspicionless drug testing ... is obvious." Maj. op. at 52.

Thus, if the trial court regarded the factual question of voluntariness as a sufficient basis for ruling that consent to CU's drug-testing program is per se invalid—i.e., involuntary as to present and prospective student athletes—that ruling is not supported by the evidence. Furthermore, because such a ruling would require an inference based upon "facts" which, by necessity, simply do not and could not exist, that finding is clearly erroneous. *See Peterson v. Ground Water Comm'n,* 195 Colo. 508, 516, 579 P.2d 629, 634–35 (1978) (inferences to be drawn from evidence will not be disturbed unless so clearly erroneous as to find no support in the record). Thus, if the trial court did conclude, as a factual matter, that no members of the plaintiff class have/can voluntarily consent to CU's drug-testing program, that finding is one that is not entitled to deference by this court.[2]

II

In my judgment, the trial court not only

---

**2.** Moreover, considering the factual question of whether consent given by student athletes can be voluntary under *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), when no deference is paid to the trial court's finding leaves this court in the position of attempting to resolve a factual question on the basis of a record that is, by necessity, inadequate to do so. The reasons this is so, of course, are the same reasons why the trial court's ruling, as characterized by the majority, is erroneous and lacks any evidentiary support: No evidence is contained in the record which provides, or could provide, the factual basis for the finding that consent is not voluntary for persons who are not yet student athletes at CU and have

not been informed of, nor "consented" to, CU's drug-testing program.

While I agree with the majority that CU bears the burden of proving the voluntariness of a consensual search, maj. op. at 946, the majority's presumption that the factual question of voluntariness is one which could be made as to this entire class creates a burden on CU which logically cannot be met under any circumstances conceivable to me. This fact adds additional support to my conclusion that the trial court did not, and could not properly, rest its decision respecting voluntariness on "alternate grounds" but had to rely on the unconstitutional conditions doctrine in order to render a decision applicable to this entire class. *See supra* § II, pp. 4–5.

could not, but did not,[3] rely on the factual question of voluntariness as its basis to conclude that the consent given by any member of the plaintiff class is involuntary. Rather, the trial court must have relied on the unconstitutional conditions doctrine as support for its conclusion because only that legal finding logically could be applicable to both present and future student athletes.[4] Consequently, resolution of this case clearly requires us to decide the question which we granted certiorari to review: Whether student athletes can give valid consent to the University's drug-testing program if their consent is a condition of participation in intercollegiate athletics at the University?

### A

While the doctrine of unconstitutional conditions has been criticized as "riven with inconsistencies," Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv.L.Rev. 1415, 1416 (1989), and commentators invariably point to the apparent tensions, ambiguities, and absence of a

clear theoretical underpinning to the doctrine, *see, e.g.,* Lynn A. Baker, *The Prices of Rights: Toward a Positive Theory of Unconstitutional Conditions*, 75 Cornell L.Rev. 1185 (1990) and Seth F. Kreimer, *Allocational Sanctions: The Problem of Negative Rights in a Positive State*, 132 U.Pa.L.Rev. 1293 (1984), there seems to be substantial agreement with respect to the general contours of the doctrine.

In its canonical form, this doctrine holds that even if a state has absolute discretion to grant or deny a privilege or benefit, it cannot grant the privilege subject to conditions that improperly "coerce," "pressure," or "induce" the waiver of constitutional rights. Thus, in the context of individual rights, the doctrine provides that on at least some occasions receipt of a benefit to which someone has no constitutional entitlement does not justify making that person abandon some right guaranteed under the Constitution.

Richard A. Epstein, *Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent, The Supreme*

---

**3.** The majority states that the authority cited by the trial court in rendering its decision supports the "obvious" conclusion that the trial court relied on alternative grounds in deciding the voluntary consent issue, maj. op. at 947–949, i.e., voluntariness as a factual matter and voluntariness as a legal question under the unconstitutional conditions doctrine. While I am willing to concede that the majority correctly characterizes the authority cited by the trial court as relying on both types of voluntariness analysis, I think it far more probative to examine the propositions which the trial court cited that authority in support of. Doing so clearly indicates that the trial court was relying almost exclusively on the unconstitutional conditions doctrine in rendering its decision (as is required by the nature of the plaintiff class).

The trial court, after citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), cited *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (unconditional conditions analysis), and *Bostic v. McClendon,* 650 F.Supp. 245 (N.D.Ga. 1986); *Feliciano v. City of Cleveland,* 661 F.Supp. 578 (N.D.Ohio 1987); *American Federation of Gov't Employees v. Weinberger,* 651 F.Supp. 726 (S.D.Ga.1986); and *Schaill by Kross v. Tippecanoe County School Corp.,* 864 F.2d 1309 (7th Cir.1988). The trial court cited each of those later four cases in support, respectively, of the following propositions: " 'Consent' by city

clerk's office and police personnel to urinalysis testing was not voluntary where employment would have been terminated if personnel refused to participate"; "Police academy cadets did not voluntarily consent to urinalysis for drug testing where cadets believed that producing urine samples was necessary to retain their jobs"; "Because signed consent to Department of Defense mandatory urinalysis drug testing was given only because jobs would be lost if consent form were not signed, the 'consent' obtained was not voluntary"; and " 'Consent' by high school student-athletes to drug testing not effective as consent because participation in urinalysis testing was required for participation in interscholastic athletics."

The trial court cited these cases as support for a finding of involuntariness based on the fact that "consent" had been given because the receipt of a governmental benefit was conditioned on giving such consent. This is precisely what the unconstitutional conditions doctrine concerns itself with.

**4.** The force of logic alone does not preclude the possibility that the trial court erred by ruling that the factual question of voluntariness is sufficient to render a decision applicable to this class. A plain reading of the trial court's ruling, however, belies such a conclusion. *See supra* p. 951 (quoting trial court's ruling) and *supra* note 3, at 953.

*Court 1987 Term,* 102 Harv.L.Rev. 5, 6–7 (1988). The question, of course, is whether this case presents one of those occasions in which the receipt of a governmental benefit may not be conditioned on an individual's agreement to waive a right guaranteed by the Constitution. I would hold that it does not.

I am aware of no authority which directly confronts and analyzes the question of how a court should determine the constitutionality of conditioning a government benefit on the waiver of Fourth Amendment rights. Though this question is not strictly one of first impression, in my opinion, the courts which have considered this issue have done so in such a way as to render their "analysis" all but useless as persuasive precedential authority.

For example, some courts simply have asserted that "a search otherwise unreasonable does not become constitutionally palatable because it is attached as a condition of employment." *Lovvorn v. City of Chattanooga,* 846 F.2d 1539, 1548 (6th Cir. 1988). Tautologically concluding that consent to an "otherwise unreasonable search," *i.e.,* one that is conducted in the absence of consent, always amounts to an unconstitutional condition is, of course, simply a way of avoiding the unconstitutional conditions question—the term "otherwise unreasonable" as used here amounts to nothing more than saying "aside from the unconstitutional conditions question, an unreasonable search is an unreasonable search."

Other courts have apparently assumed that the unconstitutional conditions doctrine stands as a per se rule proscribing the conditioning of governmental benefits on the waiver of constitutional rights. *See American Fed'n of Gov't Employees v. Weinberger,* 651 F.Supp. 726, 736 (S.D.Ga. 1986) ("Advance consent to future *unreasonable* searches is not a reasonable condition of employment."). In fact, this appears to be the presumption that the trial court adopted in rendering its judgment on the unconstitutional conditions issue: "It is quite clear that they [i.e., consents] are 'coerced' for constitutional purposes by the

fact that there can be no participation in athletics without a signed consent."

In spite of some language to the contrary, *see, e.g., Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) ("It [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests...."); *Regan v. Taxation with Representation,* 461 U.S. 540, 545, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983) ("The government may not deny a benefit to a person because he exercises a constitutional right"), the Court has not established the unconstitutional conditions doctrine as a per se prohibition on the government's ability to condition the receipt of a benefit on the waiver of constitutional rights. *See Zap v. United States,* 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477 (1946) (holding that Fourth and Fifth Amendment rights may be waived as a condition of receiving a government contract: "when petitioner, in order to obtain the Government's business, specifically agreed to permit inspection of his accounts and record, he voluntarily waived such claim to privacy which he otherwise might have had...."); *Califano v. Aznavorian,* 439 U.S. 170, 177, 99 S.Ct. 471, 475, 58 L.Ed.2d 435 (1978) ("incidental effect" of denial of social security benefits on right to travel does not render it unconstitutional); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (upholding discharge of employee for expressing labor grievance); *Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) *aff'd per curiam* (upholding sanctions against CIA agent for breaching an agreement to submit all writings about his service for prepublication review); *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (upholding the Hatch Act's ban on political campaigning by federal employees); *United Pub. Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (same). *See also* Robert L. Hale, *Unconstitutional Conditions and Constitutional Rights,* 35 Colum.L.Rev. 321, 322 (1935) ("Despite the broad language in which the doctrine of unconstitu-

tional conditions has been laid down, it is not the law that the exertion of a power is always unconstitutional when its purpose is to induce the foregoing of constitutional rights. The Supreme Court has sustained many such exertions of power even after announcing the broad doctrine that would invalidate them.").

In contrast to the approaches exemplified by *Lovvorn*, 846 F.2d 1539 (6th Cir.1988), and *Weinberger*, 651 F.Supp. 726, the Supreme Court has consistently applied a balancing test to determine what conditions on the receipt of a governmental benefit are permissible and what conditions are not. Guided by these decisions, as well as the underlying purposes of the unconstitutional conditions doctrine, I would hold that the unconstitutional conditions analysis in the context of a Fourth Amendment waiver should balance the asserted governmental interest in conditioning the benefit against the individual's interest in not being requested to waive Fourth Amendment rights in order to receive that benefit. .

### B

In upholding the conditioning of governmental benefits, the Court has regularly considered the asserted governmental interest in imposing those conditions. The governmental interest is then balanced against the interest of the recipient in order to assess whether the imposition of the condition is constitutionally permissible. *See, e.g., Clements v. Fashing,* 457 U.S. 957, 971–73, 102 S.Ct. 2836, 2847–49, 73 L.Ed.2d 508 (1982) (state's interest in preventing officeholders from vacating office prior to the end of term is sufficient to outweigh interference with first amendment rights) and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (upholding discharge of an employee after balancing employee's first amendment interests against the state's interest in promoting efficiency). *See also* Sally Lynn Meloch, Note, *An Analysis of Public College Athlete Drug Testing Programs Through the Unconstitutional Conditions Doctrine of the Fourth Amendment,* 60 S.Cal.L.Rev. 815, 832 (1987) ("the unconsti-

tutional condition doctrine reflects a balancing of the penalty against the justification"). There is no reason to assume that such a consideration is inapplicable in the context of a Fourth Amendment waiver. *See Wyman v. James,* 400 U.S. 309, 318–24, 91 S.Ct. 381, 386–89, 27 L.Ed.2d 408 (1971) (considering, *in dicta,* the governmental interest in requiring consent to home visitations in order to receive, or continue receiving, Aid to Families with Dependent Children benefits). Thus, one factor which must be considered in reviewing the trial court's unconstitutional conditions ruling is the asserted governmental interests in imposing the condition.

The next question is what factors are to be weighed against the governmental interest. The Supreme Court has stressed, particularly in the area of individual rights, that the problematic aspect of unconstitutional conditions is the coercive element they impose on the rights holder. *See, e.g., Speiser v. Randall,* 357 U.S. 513, 518–19, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958) ("the denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech"); *Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 144, 107 S.Ct. 1046, 1050, 94 L.Ed.2d 190 (1987) (invalidating denial of unemployment benefits to Seventh–Day Adventists who declined to work on Saturday concluding that the state had brought "unlawful coercion to bear on the employee's choice" between worship and work). *Cf. Coppage v. Kansas,* 236 U.S. 1, 21, 35 S.Ct. 240, 246, 59 L.Ed. 441 (1915) ("To ask a man to agree, in advance, to refrain from affiliation with the union while retaining a certain position of employment is not to ask him to give up any part of his constitutional freedom. He is free to decline the employment on those terms."); *Adler v. Board of Educ.,* 342 U.S. 485, 492, 72 S.Ct. 380, 384, 96 L.Ed. 517 (1952) (public school teachers barred from subversive activities retain the choice of working subject to restrictions or of maintaining "their beliefs and associations and go[ing] elsewhere"). *See also* Richard A. Epstein, *Foreword: Unconstitutional Conditions, State Pow-*

*er, and the Limits of Consent, The Supreme Court Term 1987,* 102 Harv.L.Rev. 5, 7 (1988) (unconstitutional conditions doctrine holds that the government "cannot grant [a] privilege subject to conditions that improperly 'coerce,' 'pressure,' or 'induce' the waiver of constitutional rights."); Kathleen M. Sullivan, *Unconstitutional Conditions,* 102 Harv.L.Rev. 1415, 1428–42 (1989) (and authority cited therein, but concluding that "coercion" itself is an insufficient rationale to support the unconstitutional conditions doctrine). Thus, a court must determine whether, and the extent to which, the condition operates so as to coerce the beneficiary into waiving his rights.

In determining what conditions are impermissible, the Court has regularly considered the importance of the governmental benefit which is subject to the condition. For example, in rejecting Indiana's defense of a welfare regulation which granted unemployment benefits only to those whose termination was for "good cause [arising] in connection with work," against a free exercise challenge, the Court in *Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), concluded that "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief.... the infringement upon free exercise is ... substantial." *Id.* at 717–18, 101 S.Ct. at 1431–32.

Similarly, in *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the Court invalidated an Arizona statute which imposed a durational residency requirement as a condition to an indigent's eligibility for nonemergency hospitalization or medical care. After characterizing *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), as a case which forbade the "denial of the basic 'necessities of life' " on the exercise of constitutional rights, *Memorial Hospital,* 415 U.S. at 259, 94 S.Ct. at 1082, the Court explained that "governmental privileges or benefits necessary to basic sustenance have often been viewed as be-

ing of greater constitutional significance than less essential forms of governmental entitlements." *Id.* Because the Arizona statute granted the receipt of a benefit "necessary to basic sustenance," in such a way as to penalize the right to interstate travel, the law was invalidated.

Though the rationale has not been expressly stated, in my opinion, the significance of the benefit must be taken into account for the simple reason that the greater the benefit, the greater the beneficiary's relative lack of freedom to refuse it; and, accordingly, accept the conditions attached to its receipt. In short, the greater the benefit the greater the coercion that is brought to bear by conditioning that benefit on the waiver of a constitutional right.

Thus, the unconstitutional conditions doctrine, in the context of a Fourth Amendment waiver, requires a balancing of the significance of the benefit of participating in intercollegiate athletics against the asserted governmental interest in imposing the condition that one waive his Fourth Amendment rights. Applying this analysis to the facts of this case, I conclude that the required waiver does not impose an unconstitutional condition on student athletes who attend CU and participate in CU's athletic program.

### C

While CU's drug-testing program conditions the receipt of a governmental benefit on the waiver of a constitutional right, the opportunity to participate in intercollegiate athletics is undoubtedly a benefit of far less import when compared to other governmental benefits, the conditioning of which have been sanctioned by the Court. *See, e.g., Thomas,* 450 U.S. 707, 101 S.Ct. 1425 (unemployment benefits); *Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (employment with CIA); *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (government employment); *Zap v. United States,* 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946) (government contracts). *See also Wyman v. James,* 400

U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (concluding, hypothetically, that receipt of welfare benefits could be conditioned on waiver of Fourth Amendment rights). Moreover, because participation in intercollegiate athletics is not necessary to basic sustenance, it is deserving of no greater constitutional protection than less essential forms of governmental benefits. *See Memorial Hospital*, 415 U.S. at 259, 94 S.Ct. at 1082.

Consequently, I would hold that given the governmental benefit at issue here, imposing the condition that the recipient waive his Fourth Amendment rights is relatively insignificant. While this determination obviously cannot be quantified, it is clear that under Supreme Court precedent far less coercion is involved here than in cases where much greater benefits, indeed, "the basic necessities of life," were constitutionally conditioned on the waiver of constitutional rights. *See Wyman*, 400 U.S. at 318–26, 91 S.Ct. at 386–90 (stating, *in dicta*, that conditioning welfare benefits on the waiver of Fourth Amendment rights is constitutionally permissible).

I suppose that the benefit of participating in intercollegiate athletics, with all its accoutrements, is indeed of some value to student athletes.[5] However, its value to potential recipients does not outweigh the governmental interest in imposing the condition on its enjoyment.

CU has asserted several interests which it seeks to further by imposition of its drug-testing program. These include CU's desire to prepare its athletes for drug testing in NCAA championship events, promoting the integrity of its athletic program, preventing drug use by other students who look to athletes as role models,[6] ensuring fair competition, and protecting the health and safety of intercollegiate athletes. In my opinion, most of these interests are valid and significant.

Thus, I am of the opinion that requiring student athletes to consent to CU's drug-testing program as a condition of participation in CU's athletic program does not impose an unconstitutional condition on the receipt of that governmental benefit.

Accordingly, I would hold that the CU drug-testing programs at issue here are constitutionally valid. Therefore, I respectfully dissent.

I am authorized to say that Justice ERICKSON joins in this dissent.

Justice ERICKSON dissenting:

Certiorari was granted to review the drug-testing program employed to test intercollegiate student athletes at the University of Colorado, Boulder (CU). We agreed to answer two specific questions:

In the context of the University's drug-testing program, whether suspicionless drug testing is constitutionally reasonable?

Whether student athletes can give valid consent to the University's drug-testing

---

**5.** I do not assume, however, that the benefit to student athletes is primarily, or in many cases even significantly, one of educational opportunity and growth; although I readily acknowledge that "the opportunity to participate in intercollegiate athletics is of substantial economic value to many students." *California State Univ., Hayward v. National College Athletic Ass'n*, 47 Cal.App.3d 533, 121 Cal.Rptr. 85, 90 (1975). While not true for all college sports, the fact that "to many, the chance to display their athletic prowess in college stadiums and arenas throughout the country is worth more in economic terms than the chance to get a college education," *id.*, has propagated the rather unfortunate climate in which "[i]t cannot be seriously maintained that college football is not a business, or that the relationship between a college and student-athlete is not a business relation-

ship." *Barile v. University of Virginia*, 2 Ohio App.3d 233, 441 N.E.2d 608, 615 (1981).

In my opinion, the beneficiaries of this "business" whose interest are given primary concern and attention are not the student athletes who attend college, but the legions of coaches, trainers, and the like as well as the universities themselves who stand to gain financially by enlisting athletes in the university's athletic program. Given the university's rather obvious raison d'etre, such prioritizing is, to put it mildly, misguided.

**6.** Although the role model rationale was offered, I can hardly believe that even the most naive freshman student would look to college athletes as role models in light of the well-documented abuses of nationally recognized intercollegiate athletic programs.

program if their consent is a condition of participation in intercollegiate athletics at the University?

These two questions address the same issue—whether drug testing of student athletes at CU, conducted without either probable cause or reasonable suspicion, is nevertheless "reasonable" and therefore constitutionally permissible.

If a student athlete voluntarily consents to a drug-testing program before entering the intercollegiate athletic program, the answer is obvious. Such a warrantless search based on voluntary consent is constitutionally permissible even absent reasonable suspicion or probable cause. *See infra* part II. If there is no valid consent, however, the answer is more difficult and requires a balancing of CU's asserted interests against a student athlete's privacy expectations to determine whether the warrantless search is reasonable, and therefore constitutionally permissible. *See infra* part I. Because I answer the two questions on which we granted certiorari in the affirmative, I dissent.

## I

The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution establish the right to be free from *unreasonable* searches and seizures. *People v. McKinstrey*, 852 P.2d 467, 470 (Colo.1993); *see also People v. Hillman*, 834 P.2d 1271, 1273 (Colo.1992). I agree with the majority that CU's drug-testing program for intercollegiate student athletes must satisfy the

reasonableness requirement of the Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution because the collection and testing of urine is a "search." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989); *People v. Williams*, 192 Colo. 249, 257–59, 557 P.2d 399, 405–07 (1976); *see generally* 3 Wayne R. LaFave, *Search and Seizure* § 10.3, at 189 (1993 Supp.).[1] The first question on which we granted certiorari concerns whether suspicionless drug testing of student athletes in the context of CU's drug-testing program is an unreasonable search. In my view, it is reasonable and therefore constitutionally permissible.

## A

In issuing the permanent injunction, the trial court concluded that any drug-testing program of student athletes administered by CU must be premised on probable cause to satisfy the reasonableness requirement of the Fourth Amendment.[2] The court of appeals disagreed with the trial court and stated that reasonable suspicion has been approved as a basis to validate warrantless searches in certain circumstances. *Derdeyn v. University of Colorado*, 832 P.2d 1031, 1035 (Colo.App.1992). The court of appeals therefore reversed that portion of the trial court's order prohibiting all drug testing of student athletes not premised on probable cause. *Id.* at 1035–36. While the majority expresses no opinion on the conclusion of the court of appeals, maj. op.

---

**1.** In determining whether an intrusion is a search under article II, section 7 of the Colorado Constitution, this court has occasionally diverged from the United States Supreme Court. *E.g., People v. Oates*, 698 P.2d 811 (Colo.1985). On these occasions, this court has determined that article II, section 7 provides more protection than does the similarly worded Fourth Amendment to the United States Constitution based on an individual's legitimate expectation of privacy. In this case, however, CU does not dispute on appeal that the drug-testing program is a search for constitutional purposes.

Accordingly, while my discussion of the reasonableness of the search at issue in this case is limited to Fourth Amendment decisions, the logic applies with equal force to article II, section

**7.** In this case, there is no basis for applying a different standard to test the reasonableness of the search under article II, section 7 than the standard applied to a search under the Fourth Amendment. *See People v. Rister*, 803 P.2d 483, 490 (Colo.1990) (concluding that Fourth Amendment balancing test used to determine whether checkpoint stops were reasonable also applied to article II, section 7); *see also Exotic Coins, Inc. v. Beacom*, 699 P.2d 930, 943 (Colo.), *appeal dismissed*, 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 214 (1985).

**2.** The trial court concluded that drug testing based on reasonable suspicion was no more sustainable than suspicionless drug testing.

950 n. 37, neither party claims that the court of appeals erred in this respect.

We granted certiorari, however, to consider the broader question addressed by the trial court, but left unanswered by the court of appeals—whether the drug-testing program in this context, premised on neither probable cause nor reasonable suspicion, is nevertheless constitutionally reasonable. The majority concludes that suspicionless drug testing of student athletes at CU is unreasonable.[3] I disagree.

## B

The question of whether a suspicionless drug-testing program is constitutionally permissible absent probable cause or reasonable suspicion is not a question of fact, but is a question of law that is subject to de novo review on appeal. *International Bhd. of Teamsters v. Department of Transp.*, 932 F.2d 1292, 1298 (9th Cir.1991). Applying settled principles of constitutional adjudication to the case before us, I conclude that within the context of CU's drug-testing program for student athletes, suspicionless drug testing satisfies the reasonableness requirement of the Fourth Amendment.

As a general matter, a search must be supported by a warrant issued upon probable cause to satisfy the Fourth Amendment reasonableness requirement. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989). It is well-settled, however, that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Id.* Accordingly, where a Fourth Amendment intrusion serves special governmental needs, as in this case, "it is necessary to balance the individual's privacy expectations against the Government's

interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Id.* at 665–66, 109 S.Ct. at 1390–91; *Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417; *see also O'Connor v. Ortega*, 480 U.S. 709, 719, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987); *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985).

The balancing test is used to determine whether a search must be supported by probable cause, reasonable suspicion, or possibly neither, in order to be reasonable. Where the balancing test precludes insistence on a showing of probable cause, the Supreme Court has "usually required some quantum of individualized suspicion before concluding that a search is reasonable." *Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417. The showing of individualized suspicion is not a constitutional floor, however, below which a search must be presumed unconstitutional. *Id.*

In fact, the Supreme Court on two occasions has employed the balancing test to uphold drug testing as reasonable, despite the absence of any individualized suspicion. *See Von Raab*, 489 U.S. at 679, 109 S.Ct. at 1397; *Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417; *see also Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 455, 110 S.Ct. 2481, 2487, 110 L.Ed.2d 412 (1990) (upholding sobriety checkpoint conducted without any individualized suspicion based on the balancing test). In these "limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417.[4]

---

**3.** Specifically, the majority holds that "for the purposes of the Fourth Amendment and Article II, Section 7, of the Colorado Constitution, CU's intercollegiate student athletes do not voluntarily consent to being searched pursuant to the drug-test program." Maj. op. at 949–950.

**4.** Under the limitations set forth by the Supreme Court, the governmental interest need not be

*compelling. Taylor v. O'Grady*, 888 F.2d 1189, 1195 n. 8 (7th Cir.1989); *see also Dimeo v. Griffin*, 943 F.2d 679, 683 (7th Cir.1991) (en banc). Instead, where an individual's privacy interests are weaker, the government need only make a lower showing of countervailing harms,

The question in this case is whether CU's particular drug-testing program directed at intercollegiate student athletes falls within the circumstances where a warrantless search can be upheld as reasonable, despite the absence of any individualized suspicion. To answer this question, it is necessary to engage in a balancing of the interests asserted by CU and the student athletes' expectations of privacy.

### 1
### *Asserted Governmental Interests*

The majority's analysis of the asserted interests offered by CU to support its suspicionless drug-testing program for student athletes is limited to the observation that CU asserts no significant public safety interests, maj. op. at 945, and the questioning of whether some of the interests asserted by CU are even significant for Fourth Amendment purposes. *Id.* I disagree with this analysis and conclude that CU's implementation of its suspicionless drug-testing program for student athletes serves important and valid public interests, including protecting the health and safety of intercollegiate student athletes and preventing drug use by other students who look to student athletes as role models.

Drug usage involves considerable risks to the health and safety of student athletes, whether or not the student athlete is impaired during practice or competition. These dangers are particularly evident with respect to anabolic steroids, which pose a serious risk to the health and safety of athletes. Protecting the health and safety of student athletes unquestionably constitutes an important interest. *See Schaill v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309, 1321 (7th Cir.1988); *O'Halloran v. University of Washington*, 679 F.Supp. 997, 1002, 1006–07 (W.D.Wash.), *rev'd on other grounds*, 856 F.2d 1375 (9th Cir. 1988); *see also Dimeo v. Griffin*, 943 F.2d 679, 682–83 (7th Cir.1991) (en banc).

and a valid or substantial interest may be sufficient to justify the conclusion that a suspicionless search is reasonable. *Dimeo,* 943 F.2d at 681; *Willner v. Thornburgh,* 928 F.2d 1185, 1188

Preventing drug use by other students who look to student athletes as role models also constitutes an important interest. As noted in *Schaill:*

Because of their high visibility and leadership roles, it is not unreasonable to single out athletes and cheerleaders for special attention with respect to drug usage. This court may take judicial notice of the fact that in the society at large drug usage by athletes is highly publicized and is a matter of great concern. Drug usage by this widely admired group is likely to affect the behavior of others and school authorities are within their discretion in conducting a program specifically directed at athletes.

*Schaill,* 864 F.2d at 1320–21. As the majority concedes, the desire to prevent drug use by other students is a significant public safety interest. Maj. op. at 945 n. 30.

The asserted governmental interests need not rise to the level of a compelling interest. *See supra* note 4. Nor must the asserted interests be related to issues of public safety or national security to be valid. As such, I conclude that the interests asserted by CU are not just commendable, but are valid, significant, and important. Against these valid interests, it is necessary to weigh the interference with student athletes privacy expectations that results from requiring student athletes to undergo a urine test. *Von Raab,* 489 U.S. at 671, 109 S.Ct. at 1393.

### 2
### *Expectations of Privacy*

The interference with individual privacy that results from the collection of urine for subsequent analysis varies depending on the circumstances. *Von Raab,* 489 U.S. at 671, 109 S.Ct. at 1393; *Dimeo,* 943 F.2d at 682. The Supreme Court has recognized that certain types of individuals have diminished expectations of privacy even with respect to such personal searches. *Von Raab,* 489 U.S. at 671, 109 S.Ct. at 1393.

(D.C.Cir.), *cert. denied sub nom., Willner v. Barr,* — U.S. ——, 112 S.Ct. 669, 116 L.Ed.2d 760 (1991); *Taylor,* 888 F.2d at 1195 n. 8.

In this case, I conclude that the student athletes who are subject to CU's drug-testing program have similarly diminished privacy expectations with respect to the intrusions occasioned by a urine test. The following factors all militate in favor of my conclusion: (1) student athletes are subject to regular and routine physical examinations; (2) student athletes voluntarily submit to extensive regulation of their personal behavior; and (3) a communal locker room atmosphere is commonplace in intercollegiate athletics. I examine each consideration separately.

Because the physical condition of a student athlete is a primary focus of intercollegiate athletics, student athletes are routinely physically examined to determine fitness to compete. *See Dimeo*, 943 F.2d at 682 (recognizing that athletes must submit to frequent medical examinations); *Schaill*, 864 F.2d at 1318 (stating that physical examinations are integral to athletic programs). Unlike most private citizens or other students, student athletes reasonably expect routine inquiry into their fitness. *Cf. Von Raab*, 489 U.S. at 671, 109 S.Ct. at 1433. As part of their annual medical examinations, student athletes provide urine samples under circumstances similar to those used in CU's drug-testing program. Throughout the year, student athletes also undergo close physical contact with both trainers and medical personnel in the course of being examined, diagnosed, and treated for injuries or potential injuries. *See O'Halloran*, 679 F.Supp. at 1005 (recognizing that in the context of athletic examinations, viewing and touching is tolerated among relative strangers that would be firmly rejected in other contexts). Based on this continuing physical examination and close physical contact with trainers and medical personnel, student athletes have diminished expectations of privacy with respect to the intrusions occasioned by a urine test. *See Dimeo*, 943 F.2d at 682 (stating that the affront to privacy that is caused by the giving of a urine sample is slight for people who are subject to frequent examinations).

The extensive regulation of behavior that student athletes voluntarily submit to further reduces their privacy expectations. Student athletes are regulated by the National Collegiate Athletic Association (NCAA), the Big 8 Conference, CU, and their individual athletic programs. Among others, the regulations include maintenance of required levels of academic performance, monitoring of course selection, training rules, practice schedules, weight and diet restrictions, curfews, and prohibitions on drug use. Significantly, student athletes at CU are already subject to the NCAA drug-testing program which mandates suspicionless urine testing of student athletes. In my view, the expectation of privacy of student athletes with respect to the intrusions occasioned by a urine test are greatly diminished based on their voluntary participation in the highly regulated area of intercollegiate athletics. *Cf. Skinner*, 489 U.S. at 627, 109 S.Ct. at 1418 (stating that "expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees"); *International Bhd. of Teamsters*, 932 F.2d at 1300 (concluding that the privacy expectations of commercial truck drivers are diminished because they voluntarily choose to enter a highly regulated profession); *Shoemaker v. Handel*, 795 F.2d 1136, 1142 (3d Cir.) (recognizing that privacy expectations of jockeys are diminished because of the regulated nature of the sport), *cert. denied*, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986).

The privacy expectations of student athletes with respect to the intrusions occasioned by a urine test are also diminished because of the communal atmosphere of locker rooms that is commonplace in intercollegiate athletics. By its very nature, a locker room setting consists of communal undress, showering, and urination. *See Schaill*, 864 F.2d at 1318; *O'Halloran*, 679 F.Supp. at 1005. In this context, it is difficult to conclude that student athletes do not have reduced privacy expectations in

being required to submit a urine sample for testing purposes.

These considerations all make it clear that participation in intercollegiate athletics is quite distinguishable from almost any other activity. *See Schaill,* 864 F.2d at 1318. The distinctive circumstances that diminish student athletes' expectations of privacy, however, do not extend beyond the limited identifiable group of intercollegiate student athletes to other groups, including collegiate students as a whole. No other group is subject to routine physical examinations, submits to extensive regulation of their behavior, and encounters a communal locker room atmosphere on a routine basis. Based on a combination of these factors, it is implausible to conclude that student athletes have strong expectations of privacy with respect to submitting urine samples for testing purposes. *Schaill,* 864 F.2d at 1319; *O'Halloran,* 679 F.Supp. at 1005.

In addition, CU has designed its drug-testing program for student athletes to significantly minimize the impact on their privacy interests. CU has attempted to reduce the intrusiveness of the collection process in a number of ways.[5] In my view, the procedures prescribed by CU for the collection and analysis of the urine samples do not carry the grave potential for arbitrary and oppressive interference with an individual's privacy interests that the Fourth Amendment was designed to prevent. *Von Raab,* 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2.

### 3
### *Outcome of the Balancing Test*

It is clear that CU has asserted important interests to justify its drug-testing program for student athletes and that stu-dent athletes, as a group, have diminished privacy expectations based on their unique circumstances. Based on the interests CU has asserted, it designed a drug-testing program for student athletes to minimize the impact on their privacy interests by reducing the intrusiveness of the collection process. Because the drug testing contemplated in this limited context does not constitute an undue infringement on the student athletes' expectations of privacy, I conclude that CU's asserted interests outweigh the privacy concerns.

The examination of the asserted governmental interests and the privacy expectations is only the initial step under the test delineated by the Supreme Court. The purpose of balancing these factors is to determine whether it is impractical to require the government to obtain a warrant or establish some level of individualized suspicion before it is permitted to conduct the search. *Von Raab,* 489 U.S. at 665–66, 109 S.Ct. at 1390–91; *Skinner,* 489 U.S. at 619–20, 109 S.Ct. at 1414–15; *Schaill,* 864 F.2d at 1313.

In this case, the student athletes do not contend that either a warrant or probable cause is required by the balance of privacy and governmental interests. Nor does it appear that such an assertion could withstand scrutiny. *See Von Raab,* 489 U.S. at 666–68, 109 S.Ct. at 1391–92; *Skinner,* 489 U.S. at 624, 109 S.Ct. at 1417; *cf. Colorado v. Bertine,* 479 U.S. 367, 371, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987) (stating that the probable-cause standard "is peculiarly limited to criminal investigations"); *South Dakota v. Opperman,* 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097 n. 5, 49 L.Ed.2d 1000 (1976) (same). Rather, the student athletes assert that CU must, at a minimum, prem-

---

**5.** Under CU's drug-testing program, the intrusion on privacy is reduced because there is no direct observation of the act of urination. *Von Raab,* 489 U.S. at 672–73 n. 2, 109 S.Ct. at 1394–95 n. 2; *Willner,* 928 F.2d at 1189; *Schaill,* 864 F.2d at 1318. The notice provided by the consent forms also significantly diminishes the subjective intrusiveness of the urine testing by reducing to a minimum any "unsettled show of authority" that may be associated with unexpected intrusions on privacy. *Von Raab,* 489 U.S. at 672–73 n. 2, 109 S.Ct. at 1394–95 n. 2;

*Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979); *Schaill,* 864 F.2d at 1320. The drug-testing program is also designed to assure that the student athletes' expectations of privacy are not subject to the discretion of the officials in charge of the program. *Schaill,* 864 F.2d at 1321. Finally, the urine samples may be examined only for specified drugs, and the use of samples to test for other purposes is not authorized. The combination of these procedures reduces the intrusiveness on the student athletes' expectations of privacy.

ise its drug-testing program for student athletes on reasonable suspicion. I disagree.

In my view, suspicionless drug testing of student athletes in this limited context is reasonable under the Fourth Amendment. To achieve the important interests asserted by CU, it is necessary to accurately detect drug use among the student athletes. As the trial court suggested, however, it is nearly impossible to ever establish reasonable suspicion of drug use among student athletes. *Cf. O'Halloran,* 679 F.Supp. at 1006. The important interests asserted by CU therefore would be placed in jeopardy, and CU's efforts to achieve these goals significantly hampered, if it were required to point to specific facts giving rise to a reasonable suspicion before testing a student athlete. *See Von Raab,* 489 U.S. at 668, 109 S.Ct. at 1392; *Skinner,* 489 U.S. at 624, 631, 633, 109 S.Ct. at 1417, 1420, 1421; *see also Dimeo,* 943 F.2d at 685; *Schaill,* 864 F.2d at 1322; *cf. United States v. Martinez–Fuerte,* 428 U.S. 543, 557, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976) (noting that requiring particularized suspicion before routine stops on major highways near the U.S.–Mexico border would be impractical). These facts, combined with the diminished privacy interests implicated by the drug testing of intercollegiate student athletes, lead me to conclude that the suspicionless drug testing of student athletes in this limited context is a reasonable search.

Because suspicionless drug testing of intercollegiate student athletes in this context is reasonable, CU's drug testing program is constitutionally permissible. Even were I to agree, however, that a drug-testing program based on no individualized suspicion was unreasonable in this context, such a search nevertheless could be constitutionally permissible based on the valid consent of the student athletes.[6] It is therefore necessary to examine the question of the student athletes' consent in this case.

## II

Based on its reading of the trial court order, the majority affirms what it characterizes as the trial court's "finding of fact" that the individual student athletes within the certified class did not voluntarily consent to CU's drug-testing program for student athletes. Maj. op. at 947.[7] As a result, the majority does not reach the second issue on which we granted certiorari. *See* maj. op. at 935.

Because I disagree with the majority's characterization of the trial court order, and instead would find that the trial court concluded as a matter of law that no student athlete could validly consent to the drug testing program, I am compelled to address the second question on which we granted certiorari. I would conclude that CU may validly condition a student ath-

---

**6.** A warrantless search is constitutionally permissible under the Fourth Amendment if an individual student athlete has voluntarily consented to it, regardless of whether the search is conducted based on probable cause, reasonable suspicion, or 'no suspicion at all. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see generally* 3 Wayne R. LaFave, *Search and Seizure* § 8.1 (1987 & 1993 Supp.). The majority's conclusion that the consent at issue in this case was not voluntary as a factual matter does not negate the elementary proposition that a warrantless search based on voluntary consent would be constitutionally permissible even absent reasonable suspicion.

**7.** The class certified pursuant to C.R.C.P. 23 consists of:

Those present and prospective undergraduate student athletes who are or will be subject to the University of Colorado intercollegiate ath-

letic department's drug education program as a *condition of participation* in the University of Colorado intercollegiate athletic program limited as follows: Those present undergraduate student athletes who have never tested positive or have been subject to discipline or sanction as a result of a positive test result; and those present student athletes, who, although having executed waivers, consents or agreements to participate in the University of Colorado's drug education program, object to the program as being *an unconstitutional condition of participation; and lastly, those prospective undergraduate student athletes* who will execute waivers, consents or agreements to participate in the University of Colorado's drug education program, but who object to the program as being an *unconstitutional condition of participation.*

lete's participation in intercollegiate athletics on a student athlete's knowing and voluntary consent to a drug-testing program.

### A

I agree with the majority that as an appellate court, "we must defer to the trial court's findings on the factual issue of voluntariness unless its findings are clearly erroneous or not supported by the record." Maj. op. at 946 (citations omitted). This rule of deference, however, is limited to factual findings contained in a trial court's order and not to the trial court's legal conclusions, which we review de novo.

In my view, the majority avoids answering the question on which we granted certiorari by erroneously characterizing the trial court's legal conclusions on the question of consent as findings of fact. Maj. op. at 947. It is clear from a plain reading of the trial court's order that it made no findings of fact regarding the validity of consent given by any individual member of the class. Instead, the trial court relied on the unconstitutional conditions doctrine to conclude as a matter of law that no student athlete could validly consent to a drug-testing program.

The sole factual finding made by the trial court with regard to the consent issue related to all student athletes, and *nowhere* in the trial court's order is there a factual determination that *any* individual class member failed to give voluntary consent or was in any way influenced by duress or coercion.[8] The factual findings relating to consent that the majority defers to actually appear within the trial court's order as "conclusions of law."[9] This is not surprising, because the broad injunctive relief granted by the trial court is appropriate only if the trial court decided the voluntary consent issue based on the unconstitutional conditions doctrine.[10]

8. In its only factual finding regarding the consent issue, the trial court stated:
   In all phases of the program the student athletes have been required to sign a "consent" form in order to participate in intercollegiate athletics. If a student does not sign the form the student may not participate in intercollegiate athletics at the University.

9. In reaching the determination that the trial court's factual findings are not clearly erroneous, the majority fails to acknowledge that the language it cites from the trial court's order is contained in the section labeled conclusions of law and relate entirely to the trial court's legal determination that CU may not constitutionally condition an athlete's participation in athletics on the signing of a consent form. The trial court concluded that:
   The evidence produced during this trial failed to establish that the consents given by the University's student-athletes are voluntary. It is quite clear that *they are "coerced" for constitutional purposes by the fact that there can be no participation in athletics without a signed consent.* As in the cases cited, the "consent" obtained by the University is not voluntary....

10. The trial court permanently enjoined CU from requiring any urine samples from student athletes for the purposes of drug testing. In other words, the order struck down *all* drug-testing programs as they relate to *all* student athletes and not just class members. Thus, even if CU could demonstrate that any of its present or future student athletes voluntarily consented to the drug-testing program, CU would still be enjoined from conducting any drug-testing program.

Such a broad-based injunction would be warranted if the student athletes' unconstitutional conditions claim was valid. In such a case, the conditioning of the right to represent CU on the signing of the consent form would preclude any student athlete from voluntarily consenting to the drug-testing program. On the other hand, such a broad injunction would be inappropriate if the trial court believed that the class representatives, and therefore the class, did not voluntarily consent as a matter of fact to the drug-testing program. In such a case, the drug-testing program would have been enjoined as to the class, but not as to all student athletes.

Moreover, it is implausible to contend that the trial court could have entered the injunction as to the group of "prospective undergraduate student athletes" without relying on the unconstitutional conditions doctrine. It would have been impossible for the trial court to conclude as a matter of fact that this group did not voluntarily consent to the drug-testing program insofar as no representative of the group appeared before the trial court. Simply stated, there are no factual findings for the majority to defer to on the question of whether prospective student athletes consented to an unspecified future random drug-testing program.

The effect of the majority opinion is to uphold the trial court's legal determination that this group of individuals who, even though they have not yet considered whether they wish to attend CU to participate in athletics or whether they wish to consent to a random drug-testing

The foregoing considerations all suggest that the trial court concluded, *as a matter of law*, that the consents given by CU student-athletes were not voluntary and did not exempt CU from the constitutional requirements of the United States and Colorado Constitutions. Accordingly, I disagree with the majority's unnecessary deference to the trial court's legal conclusions and would reach the unconstitutional conditions issue squarely presented by both the trial court's order and the issue on which we granted certiorari.[11]

B

An unreasonable search is nevertheless constitutionally permissible when it is conducted based on voluntary consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The question presented on appeal is *not* whether certain individual student athletes voluntarily consented to the drug-testing program of student athletes, but whether all student athletes at CU cannot voluntarily consent, as a matter of law, if their consent is a condition of their participation in intercollegiate athletics. The student athletes contend, and the trial court concluded, that representing CU in intercollegiate athletics

cannot be conditioned on their giving consent to a random drug-testing program. I disagree.

The unconstitutional conditions doctrine relied on by the trial court in reaching its legal conclusion derives from *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). *Perry* stated:

> Even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes on his constitutionally protected interests—especially his interest in freedom of speech.

*Id.* at 597, 92 S.Ct. at 2697. The determination of whether the unconstitutional conditions doctrine precludes consent from ever being voluntary involves a balancing of the governmental interests involved and the benefit that will be lost if consent is not given.

The Supreme Court repeatedly has held that governmental benefits far more significant than participation in intercollegiate athletics can be conditioned on waiving the exercise of a constitutional right. *See, e.g.,*

---

program, are incapable of voluntarily consenting to any random drug-testing program. Only with the assistance of the unconstitutional conditions doctrine could the trial court have declared that all student athletes, including the as yet undetermined group of prospective student athletes, were incapable of giving consent as a matter of law.

**11.** We denied certiorari on the issue of whether we should decertify this case as a class action. Specifically, that issue was:

> Did the court of appeals err in sustaining a class action judgment on grounds that apply only to a few members of the class.

In my view, our denial of certiorari on the decertification of class issue was justified at that time because we granted certiorari to resolve the voluntariness of consent issue on the basis of the unconstitutional conditions doctrine. The majority, by refusing to decide the unconstitutional conditions issue, calls into doubt the legal underpinnings of the original class certification because the record contains no support for the majority's deference to the trial court's "factual determinations" as representative or typical of all of the members of the class. For

example, it is unclear to me how permanent injunctive relief could be granted in this case to an entire group of individuals, such as prospective student athletes, if no member of that group appeared before the trial court or testified about their individual experiences regarding the voluntariness of consent that would be obtained from them at some time in the future. *See supra* note 10.

Fundamental fairness should dictate that CU should not be permanently enjoined from conducting a random drug-testing program in the future, nor should student athletes be precluded from participating in such a program, so long as it can be established that the student-athletes voluntarily consent to participate. If we are going to purposefully avoid application of the unconstitutional conditions doctrine in this case, we should address the question of whether the representatives who appeared and testified before the trial court are typical of *all* members of the certified class. *See* C.R.C.P. 23(a)(3) (stating that one or more members of a class may sue as representative parties on behalf of all "only if the claims or defenses of the representative parties are typical of the claims or defenses of the class").

*Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (employment with the Central Intelligence Agency (CIA) can be conditioned on an employee's consent to pre-publication review and censorship of any publication concerning the CIA); *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (government employment can be conditioned on the prohibition of partisan political activity by employees); *Wyman v. James*, 400 U.S. 309, 324, 91 S.Ct. 381, 389, 27 L.Ed.2d 408 (1971) (receipt of welfare benefits can be conditioned on recipient's consent to inspection of home); *cf. Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984) (post-graduate financial aid can be conditioned on draft registration without violating the Fifth Amendment privilege against self-incrimination).[12]

*Wyman v. James* is instructive on the issue of whether conditioning participation of student athletes in intercollegiate athletics on consent to a random drug-testing program is an unconstitutional condition. The case involved a Fourth Amendment challenge to an Aid to Families with Dependent Children (AFDC) requirement that denied AFDC benefits to any program recipient who refused to consent to a caseworker "visitation" of their home. *Wyman*, 400 U.S. at 311–12, 91 S.Ct. at 382–83. Government representatives informed Mrs. James, a recipient of AFDC benefits, that she would lose her benefits if she refused to consent to the visitation. *Id.* at 313–14, 91 S.Ct. at 383–84. She brought suit for de-

claratory and injunctive relief, alleging that conditioning her AFDC benefits on the requirement that she consent to the visitation violated her Fourth Amendment right to be free from unreasonable searches.

In rejecting Mrs. James's Fourth Amendment claim, the Supreme Court stated:

> the visitation in itself is not forced or compelled, and [ ] the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and there is no search.

*Id.* at 317–18, 91 S.Ct. at 385–86. The Supreme Court also added that "what Mrs. James appears to want from the agency that provides her and her infant son with the necessities for life is the right to receive those necessities upon her own informational terms, to utilize the Fourth Amendment as a wedge for imposing those terms and to avoid questions of any kind." *Id.* at 321–22, 91 S.Ct. at 387–88.

The factual situations presented in *Wyman* and the present case are analogous. The home visitation in *Wyman* and the drug testing in this case are not designed to gather evidence for use in a subsequent criminal prosecution, but ensure compliance with the requirements of the respective programs.[13] However, the benefit involved in this case, participation in intercollegiate athletics, is certainly less of a recognized interest than the benefit at stake in *Wyman*, the loss of State provided "nec-

---

**12.** Commentators view this line of Supreme Court precedent as determinative of the question of whether conditioning participation in intercollegiate athletics on the signing of a consent form for drug-testing programs is constitutionally permissible. *E.g.,* Alex M. Johnson & James F. Ritter, *The Legality of Testing Student-Athletes for Drugs and the Unique Issue of Consent,* 66 Or.L.Rev. 895 (1987). These commentators conclude that there is presently no constitutional bar to conditioning participation in this manner. *See id.* at 921–22 (stating that "the Court has approved 'coerced consent' under circumstances closely analogous to the drug-testing procedures adopted by [various Universi-

ties] and the NCAA.... Short of the Court overruling itself on the consent issue, no other fourth amendment issues need be raised").

**13.** *Wyman* stated:

> The home visit is not a criminal investigation, does not equate with a criminal investigation, and ... is not in aid of any criminal proceeding. If the visitation serves to discourage misrepresentation or fraud, such a byproduct of that visit does not impress upon the visit itself a dominant criminal investigative aspect.

*Wyman,* 400 U.S. at 323, 91 S.Ct. at 389.

essities for life."[14] Moreover, the privacy interest in this case is certainly lower than in *Wyman.* *See supra* part I.B.2.

The consent to random drug testing is not *per se* invalid for all student athletes at CU simply because it is a condition of representing the school in intercollegiate athletics. Student athletes remain free to withhold their consent to the drug-testing programs or to individually challenge the voluntariness of their own consent. Alternatively, student athletes may decide to participate in intercollegiate athletics at colleges or universities with drug-testing programs more suitable to their individualized expectations of privacy. "The choice is entirely [theirs], and nothing of constitutional magnitude is involved." *Wyman,* 400 U.S. at 324, 91 S.Ct. at 389.

### III

I would answer both of the questions on which we granted certiorari affirmatively. In the limited context before us, I conclude that suspicionless drug testing of intercollegiate student athletes is a reasonable search under the Fourth Amendment of the United States Constitution and article II, section 7 of the Colorado Constitution. I would also conclude that CU may validly condition student athletes' participation in intercollegiate athletics on a knowing and voluntary consent to the drug-testing program. Accordingly, I would reverse the judgment of the court of appeals.

Chief Justice ROVIRA joins in this dissent.

---

**14.** Courts repeatedly have held that, unlike certain expectations like continued employment and attending college, participation in athletics is not a constitutionally protected interest be-

cause there is no legitimate expectation of continued participation. *See Bailey v. Truby,* 174 W.Va. 8, 321 S.E.2d 302, 314–15 (1984) and cases collected therein.